FILED
United States Court of Appeals
Tenth Circuit

**March 30, 2010**

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

## UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,

and

VESCOR CAPITAL CORP., a Nevada
corporation; VESCOR CAPITAL, INC., a
Nevada corporation; VESCORP CAPITAL,
LLC, a Nevada limited liability company;
VESCORP CAPITAL IV-A, LLC, a
Nevada limited liability company;
VESCORP CAPITAL IV-M, LLC, a
Nevada limited liability company; VAL E.
SOUTHWICK,

      Defendants,
------------------------------

HERITAGE CAPITAL MANAGEMENT,
LLC; COVENANT BANCORP, INC.;
COVENANT CAPITAL, LLC;
HERITAGE ORCAS PARTNERS, LP;
HERITAGE ORCAS VL PARTNERS, LP;
BOUNDARY BAY CAPITAL, LLC,

      Movants - Appellants,
v.

ROBERT G. WING,

      Receiver - Appellee.

No. 08-4224

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 1:08-CV-00012-DB)**

Peter Billings (with Timothy K. Clark on the briefs), Fabian & Clendenin, Salt Lake City, Utah, for Movants-Appellants.

M. David Eckersley, Prince, Yeates & Geldzahler, Salt Lake City, Utah, for Receiver-Appellee.

Before **HENRY**, Chief Judge, **BRISCOE**, and **LUCERO**, Circuit Judges.

**HENRY**, Chief Judge.

The SEC filed a complaint against Val E. Southwick and a variety of companies he controlled (Vescor Capital Corp.; Vescor Capital, Inc., Vescorp Capital, LLC, Vescorp Capital IV-A, LLC; Vescorp Capital IV-M, LLC; together "Vescor"), alleging that Mr. Southwick operated a massive Ponzi scheme that defrauded several hundred investors of approximately $180 million. Soon thereafter, the SEC sought and obtained the appointment of a receiver to manage and control all Vescor-related assets as well as any other entity directly or indirectly controlled by Mr. Southwick. A group of investors, which included Heritage Capital Management, LLC; Covenant Bancorp, Inc.; Covenant Capital, LLC; Heritage Orcas Partners, LP; Heritage Orcas VL Partners, LP; and Boundary Bay Capital, LLC (collectively, the "Covenant Group"); had advanced over

2

$66 million to various Southwick-related entities, and were caught within the receiver's wide net. The district court granted a stay of all actions related to property in the receivership estate.

Contending that it held liens on property within the receivership estate, Covenant Group requested the district court lift the stay and allow (1) Covenant Group to foreclose on its property; and (2) certain unrelated state tort litigation to proceed. The district court denied the lifting of the stay as to the Covenant Group's property and allowed the modification as to the state tort litigation. The Covenant Group appeals the district court's refusal to lift the stay. Having jurisdiction under 28 U.S.C. § 1292(a)(1), we affirm the district court's ruling and hold that the district court acted well within its equitable powers and discretion in denying the Covenant Group's motion to lift the stay.

## I. BACKGROUND

On February 6, 2008 , the SEC issued an enforcement action alleging that Mr. Southwick, through Vescor, violated federal securities laws by selling unregistered notes and other securities to finance various real estate projects. On May 5, 2008, the district court, pursuant to Fed. R. Civ. P. 66 and its general equitable jurisdiction, appointed Robert G. Wing as Vescor's receiver. The order empowered the receiver to "take control of [Vescor's] funds, assets and property wherever situated." Aplts' App. vol. I, at 50.

Long before the creation of this receivership, from  2000-2005, the Covenant Group loaned over $66 million to entities related to Vescor. The loans related to nine

3

separate real properties in Nevada (the "Nevada Properties"), located near Las Vegas. The Covenant Group maintains that it is one of the secured lenders in these Nevada Properties. According to the Covenant Group, each loan was fully secured by collateral through an assignment of a fractional share in a recorded deed of trust. *Id.* at 63. Covenant Group serves as the loan manager, managing the loan for the fractional interest holders. After the loans on the Nevada Properties went into default, the Covenant Group, as loan manager, instituted non-judicial proceedings to foreclose on the liens. These proceedings were stayed upon the district court's May 5, 2008 appointment of Mr. Wing as receiver.

On July 31, 2008, after receiving notification of the inclusion of the Nevada Properties in the receivership, the Covenant Group filed its "Motion to Clarify the Scope of the Stay, and, if Necessary, to Lift the Stay," with respect to litigation ensuing in Nevada and the Nevada Properties. In the motion to lift the stay, the Covenant Group argued that the Nevada Properties are not sufficiently related to the Vescor proceedings to justify their inclusion in the corpus of the receivership, and in turn, that the receivership should not preclude the Covenant Group's non-judicial foreclosure proceedings. *Id.* at 74. "Because the receiver cannot make a defensible claim of any value to the completely encumbered real property subject to [non-judicial foreclosures], staying those non-judicial proceedings is an unduly broad application for the Receivership Order." *Id.*

4

In response, the receiver pointed out that his focus, which tracks the district court's purpose in the appointment of a receiver, is to marshal and safeguard the disputed assets, ensure the proper administration of that property, and achieve a final equitable distribution of the assets if necessary. *Id.* at 336-67. The receiver had recently taken possession of extensive records and files, issued many subpoenas, and was reviewing, gathering and evaluating the multitude of transactions underlying the Vescor properties.

After an October 3, 2008 hearing, the district court issued an order that concluded the receiver:

> is authorized to market any real property held by the estate, subject to the obligations under U.S.C.A. § 2001, which allow, among other things, for interested parties to make an objection to any proposed sale. If any sale is approved by the Court, all of the liens on the real property shall attach to the proceeds of the sale. The validity and priority of these liens will be determined at a later time by the Court.

*Id.* vol. II, at 644 (Order, filed Nov. 17, 2008). The district court denied the motion to lift the stay.[1]

---

[1] Although not relevant for this appeal, the district court granted the Covenant Group's motion in part by clarifying the stay to allow the Covenant Group to proceed with its tort claims against three individuals in the ongoing Nevada litigation. *See* Aplts' App. vol. II, at 644 ¶ 4 ("The stay is clarified; the Covenant Group may proceed with any tort claims it may have against Douglas Malan, William Plise, and Christopher Layton.").

## II. DISCUSSION

On appeal, Covenant Group raises two arguments. First, it argues that the district court exceeded its equitable powers when it put the stay in place. Second, it maintains that the receiver showed no compelling justification to maintain the stay with respect to its secured liens in the Nevada Properties. We reject both arguments.

### A. The district court did not exceed its equitable powers when it ordered the stay.

The jurisdictional limits to the district court's power in equity receivership proceedings are issues of law, reviewed de novo. *S.E.C. v. Am. Capital Inv., Inc.*, 98 F.3d 1133, 1142 (9th Cir. 1996), *abrogated on other grounds by Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998). Covenant Group first argues that the district court, while endowed with considerable equitable powers in administering a federal receivership, has ignored the "general rules governing receiverships," and the property laws underlying them. Aplts' Br. at 4. Specifically, it argues that, as the holder of valid liens and as a secured creditor, it is entitled to different and more favorable treatment, than that given to unsecured creditors. Second, Covenant Group contends that as a policy matter, "punish[ing]" those with recorded security interests will inhibit future lending secured by real property. *Id.* at 6. Covenant Group argues that the receiver's arguments are inconsistent, as the receiver moved to relinquish two properties held by another secured creditor, and that this further undermines any "policy" decision.

6

A brief history of the development of the district court's equitable powers in this area will help set the scene. Under the Judiciary Act of 1789, 28 U.S.C. § 41(1), Congress gave the lower federal courts original jurisdiction "of all suits . . . in equity," where the other jurisdictional requisites are satisfied. "From the beginning, the phrase 'suits in equity' has been understood to refer to suits in which relief is sought according to the principles applied by the English Court of Chancery before 1789, as they have been developed in the federal courts**."** *Gordon v. Washington*, 295 U.S. 30, 36 (1935). As Justice Scalia has noted, however, "the equitable powers conferred by the Judiciary Act of 1789 did not include the power to create remedies previously unknown to equity jurisprudence." *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond,* 527 U.S. 308, 332 (1999).

Given this backdrop, we look to the Federal Rules of Civil Procedure, which gives the district court summary jurisdiction over all the receivership proceedings:

> These rules govern an action in which the appointment of a receiver is sought or a receiver sues or is sued. But the practice in administering an estate by a receiver or a similar court-appointed officer must accord with the historical practice in federal courts or with a local rule. An action in which a receiver has been appointed may be dismissed only by court order.

Fed. R. Civ. P. 66. Rule 66 does not provide specific instructions to receivers on how to administer or manage the receivership estate. Rather, Rule 66 instructs receivers to follow traditional equity practice or local rules (where they exist) for administrative

matters like the procedure for disposing of or distributing assets. By statute, Congress has instructed federal receivers to manage receivership property according to the law of the state where the property is located. 28 U.S.C.A. § 959(b) (receiver must manage and operate the property "in the same manner that the owner or possessor thereof would be bound to do" under applicable state law).

It is generally recognized "that the district court has broad powers and wide discretion to determine . . . relief in an equity receivership." *SEC v. Safety Fin. Serv., Inc.*, 674 F.2d 368, 372-73 (5th Cir. 1982) (quoting *SEC v. Lincoln Thrift Ass'n*, 577 F.2d 600, 609 (9th Cir. 1978)). This discretion derives from the inherent powers of an equity court to fashion relief. *Id.*

1. *The district court's actions were in accord with the general rules governing receiverships.*

Without reference to caselaw in support of its argument, the Covenant Group assails the district court's actions as outlandish. But the Covenant Group's arguments simply conflict with the goals of receivership. When a district court creates a receivership, its focus is "to safeguard the assets, administer the property as suitable, and to assist the district court in achieving a final, equitable distribution of the assets if necessary." *Liberte Capital Group, LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006). As the receiver's counsel points out, since his appointment, he "has taken possession of extensive computer records and hundreds of boxes of files. He does not yet have all of

8

the information relating to Vescor transactions." Aplts' App. vol. I, at 337. The receiver also suggests that various Covenant Group transactions were not properly accounted for or documented; he points to an affidavit from a former Assistant Controller of Vescorp Capital, LLC, stating that money from new investors was commingled with other money in Vescor accounts and that commingled funds were used to pay Vescor's obligations to previous investors. The receiver argues that he needs to confirm whether the Covenant Group was an insider on certain transactions, and to sort out all the accounting irregularities, which seem to be legion. *See id.* at 337-38.

Contrary to the Covenant Group's protestations, the district court properly focused on safeguarding the Vescor investors' assets as a whole. At the hearing on the motion to clarify/lift the stay, the court specifically noted that

> part of the [receiver's] duties is to make sure that [the receivership's properties] don't get improperly dissipated and diminished in value along the way. . . . along with the goal of providing a fair recovery as far as a fair recovery can be made with respect to what is out there. . . . And if the secured creditors . . . are deemed under the law and under any formula considered fair by the receiver, then that will be the way that the proceeds will get distributed.

*Id.* vol. II, at 555.

Moreover, the receiver acknowledged that "once [he] had time to investigate[] and find this all out, then we can come back to the Court and talk about the plan of distribution." *Id.* at 556. At that point, the Covenant Group can raise its argument as to

9

its distribution priority . But at this juncture, the receiver cannot distinguish the Covenant Group from other investors unable to extract such special considerations.

The Covenant Group argues that its purported secured liens should not be treated on par with unsecured creditors' liens. Specifically, it fears the district court's statement that "many people were defrauded, and at this point I think we should anticipate treating them all on a *pro rata* basis." *Id.* at 535.

First, typically, secured creditors have recourse against specific collateral, and must be paid out of the proceeds of that collateral. It is quite possible, as the receiver notes, that secured creditors like the Covenant Group will fare better – proportionally speaking – than any other claimants. After the receiver formulates a plan of distribution, the issues of setoff and expenses can and will be litigated before the district court at a later point. We note that the district court evidently recognized the difficulty of the process when it stated that the distribution of the corpus "is going to be of serious deliberation and consideration by the Court." Aplts' App. vol. II, at 562.

We also recognize that if the assets of the receivership are insufficient to give full recovery to all victims, the Covenant Group will not be satisfied with the ultimate plan the district court formulates, as it will likely return only a fractional amount of its original investment. But, as noted, the Covenant Group can make its arguments as to its security interests in the receivership court, after the plan is formulated. In cases such as these, "[a]n equitable plan is not necessarily a plan that everyone will like." *SEC v. Credit*

*Bancorp, Ltd.*, No. 99 Civ. 11395 RWS, 2000 WL 1752979, at \*29 (S.D.N.Y. Nov. 29, 2000).

      2.     *The district court's denial of the motion to lift the stay was a sound policy decision.*

The Covenant Group asserts that the district court's denial of its motion to lift the stay was "surely not a sound policy decision." Aplts' Br. at 6. The Covenant Group contends that the district court's actions effectively invalidated its secured liens, despite the receiver's duty to "respect prior liens on the property brought into receivership." *Id.* at 3. It maintains that future lenders will be less likely to make such loans believing that a validly secured interest will not be honored; it argues that the court's actions appear inconsistent, as the court recognized another lender's valid security interest when it granted the SEC's motion to relinquish two properties.

While the Covenant Group's assessment of a receiver's power is generally accurate ("As a starting point, 'the general rule of law is that appointment of a receiver does not determine any rights nor destroy any liens.'" (citations excluded), *id.* at 3) and that secured claims are superior to those of general creditors, *id.* at 4, the Covenant Group misunderstands the effect of the receiver's actions here. The receiver's actions to this point do not invalidate or otherwise impact *any* party's perfected security interest. Rather, "[t]he [r]eceiver is charged with protecting the investments of all the . . . investors. . . . The best way to maintain the status quo is to permit him to carry on with

11

his investigation." Aple's Br. at 4 (quoting *SEC v. Byers*, 592 F. Supp. 2d 532, 537 (S.D.N.Y. 2008).

In the end, the Covenant Group's arguments have no traction. As indicated above, secured interest holders will generally receive preferential treatment under a receiver's final distribution plan, but we are not yet at that stage of the proceedings. Furthermore, there was no inconsistency when the court granted the receiver's relinquishment of his claim on two other lots held by a secured lender. U.S. Bank National Association held a secured $3 million encumbrance on these two properties. The Covenant Group objected to the receiver's motion to relinquish this property, arguing that it, like U.S. Bank, was a secured creditor, and as such there was no cognizable substantive difference between the two entities. According to the Covenant Group, both it and U.S. Bank had secured claims in excess of the value of the underlying collateral.

Yet the receiver and the district court correctly viewed the two interests as quite different. As the receiver noted,

> U.S. Bank *loaned* money to VesCor in an arms-length transaction, and the terms of the loan appear commercially reasonable. The Covenant Group, on the other hand, appears to be an VesCor *investor*. Tellingly, the terms of its "loans" to VesCor include interest, "discounts" of up to 30%, and "profit participation" if the properties were sold for a profit.

Aplts' App. vol. II, at 631 (emphasis supplied). The Covenant Group is thus very different from U.S. Bank, and stands in the same shoes as all of the Vescor investors who

12

"were duped in the same way" and who "were promised a valid security interest in Vescor assets." *Id.* We reject the Covenant Group's suggestion that the district court inconsistently treated U.S. Bank more favorably.

**B.** **The district court acted within its discretion when it denied the Covenant Group's motion to lift the stay.**

We review the district court's decision for an abuse of discretion. *Commodity Futures Trading Comm'n v. Chilcott Portfolio Mgmt, Inc.*, 713 F.2d 1477, 1483 (10th Cir. 1983); *SEC v. Wencke*, 742 F.2d 1230, 1231 (9th Cir. 1984). Both parties cite *SEC v. Wencke*, 742 F.2d at 1231, for providing the framework to consider for lifting the stay. We agree that *Wencke* is relevant and adopt its three-factor test:

> (1) whether refusing to lift the stay genuinely preserves the status quo or whether the moving party will suffer substantial injury if not permitted to proceed;
> (2) the time in the course of the receivership at which the motion for relief from the stay is made; and
> (3) the merits of the moving party's underlying claim.

*Id.* We agree with the Ninth Circuit that, given the broad interests of the receiver, we should "not appl[y] the traditional preliminary injunction test in ruling on motions to except applicants from a blanket receivership stay." Thus, the *Wencke* framework we adopt is not exactly the same as that a court would apply when considering lifting a typical preliminary injunction:

> [The *Wencke*] test differs in emphasis from the traditional equitable criteria employed by courts to decide whether to grant, deny, or continue a preliminary injunction. The traditional

13

> preliminary injunction test would require the Receiver to show a probability of success on the merits and the possibility of irreparable harm to the receivership if the stay is not continued.

*S.E.C. v. Universal Fin.*, 760 F.2d 1034, 1038 (9th Cir. 1985). Instead, in a receivership-imposed stay, we balance the interests of the receiver and the moving party. *Id.*

As the Third Circuit noted, applying the *Wencke* framework to a receivership stay of litigation,

> [t]he purposes of a receivership are varied, but the purpose of imposing a stay of litigation is clear. A receiver must be given a chance to do the important job of marshaling and untangling a company's assets without being forced into court by every investor or claimant. Nevertheless, an appropriate escape valve, which allows potential litigants to petition the court for permission to sue, is necessary so that litigants are not denied a day in court during a lengthy stay.

*United States v. Acorn Tech. Fund, L.P.*, 429 F.3d 438, 443 (3d Cir. 2005). We also agree with the Third Circuit's acknowledgment that non-bankruptcy receiverships are relatively rare, as evidenced by our circuit's not having addressed this exact issue. *Id.* Given the unique position of the receiver in this situation, we conclude that the *Wencke* framework appropriately addresses the interests of the parties to the litigation.

And, in a case involving a Ponzi scheme,

> the interests of the Receiver are very broad and include not only protection of the receivership *res*, but also protection of defrauded investors and considerations of judicial economy. This is a corollary of the district court's power to enter a blanket stay. This power is *broader* than the court's authority to grant or deny injunctive relief under Fed. R. Civ. P. 65.

14

*Universal Fin.*, 760 F.2d at 1038 (emphasis supplied) (citations omitted). We also note that, although the district court did not apply *Wencke,* the record before us is sufficiently developed to allow us to apply the *Wencke* framework in first instance. *See Acorn Tech. Fund*, 429 F.3d at 445 (applying *Wencke* standard to a claim, even though the district court did not apply *Wencke* in the first instance, because the record "was sufficiently developed").

### 1. *Status quo*

The first concern under the *Wencke* framework is preservation of the status quo. The Covenant Group argues that, far from preserving the status quo, the district court's continuation of the stay has upset the status quo because it impeded its ability to complete its non-judicial foreclosure on the Nevada Properties. The Covenant Group contends that the receiver has begun to market the properties and that the Covenant Group is precluded from exercising certain rights under this process, such as the right to engage in a "credit bid."[2] However, despite the Covenant Group's inability to offset its bid through a bankruptcy credit bid process, as the Covenant Group admitted at oral argument, it is still

---

[2] Section 363(k) of the Bankruptcy Code authorizes secured creditors to purchase property through credit bids. *See* 11 U.S.C. § 363(k) (stating that at a sale "of property that is subject to a lien that secures an allowed claim, . . . the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property").

15

free to take part in the bidding on the property through the receivership. We agree with the receiver that to remove the Covenant Group's properties from the receivership will upset the status quo, which attempts to preserve the assets of the defrauded investors. *See SEC v. Byers*, 592 F. Supp. 2d 532, 537 (S.D.N.Y. 2008) (rejecting movants' attempts to challenge an injunction imposed involving a Ponzi scheme, applying *Wencke*, and concluding that "the best way to maintain the status quo is to permit [the receiver] to carry on with his investigation"). We hold that this *Wencke* factor weighs in favor of the receiver.

### 2. *Timing*

As to the second *Wencke* factor of timing, the Covenant Group argues that this factor is not relevant. "The Receiver does not need any time to investigate the receivership estate of other factual matters related to the Nevada [Properties]" for two reasons: (1) the Covenant Group has recorded security interests in these properties, and (2) there is no equity in these properties. Aplts' Br. at 16. As noted above, the Covenant Group overstates the case, as the receiver perceives that various transactions appear irregularly accounted for, suspects possible commingling of funds, and believes the Covenant Group likely received discounts and special consideration not available to other investors.

The timing factor is case-specific. As to the timing of events, the SEC filed its complaint in February 2008, the district court appointed the receiver three months later in

16

May 2008. The Covenant Group filed its motion on September 22, 2008, the court heard arguments the next month in October 2008 and issued its order on November 17, 2008. Although a year has passed through the course of this appeal, "[a] receiver must be given a chance to do the important job of marshaling and untangling a company's assets without being forced into court by every investor or claimant." *Acorn Tech. Fund,* 429 F.3d at 443. "[V]ery early in a receivership even the most meritorious claims might fail to justify lifting a stay given the possible disruption of the receiver's duties." *Id.* at 443-44.

Given the passage of time now, it is possible that the receiver has made progress sorting through the various accounting issues, but there is no doubt that at the time of the court's order, "the receiver's need to organize and understand the entities under his control may [have] weigh[ed] more heavily than the merits of the [moving] party's claim." *Universal Fin.*, 760 F.2d at 1038. Undoubtedly, as time progresses, the merits of Covenant Group's claim "may loom larger in the balance." *Id.* at 1039. For the purposes of this appeal, we hold that the element of time tips in favor of the receiver.

3.      *Merits of the Covenant Group's underlying claim*

The Covenant Group insists that because it holds valid liens on the Nevada Properties, these liens are immune from any suggestion of fraudulent conveyance. As the receiver notes, the Covenant Group cites no case law in support of this assertion. This argument also overlooks the suspected loan discounts and special consideration the Covenant Group may have received. Although this underlying claim "may have merit,

the other factors do not weigh in favor of [lifting the stay] at the present time." *See Acorn Tech. Fund*, 429 F.3d at 450. "While it is true that '[t]he receivership cannot be protected from suit forever,' we find that the [Covenant Group] ha[s] not carried [its] burden of proving that the stay should be lifted." *Id.* (quoting *Wencke*, 742 F.2d at 1231).

### III. CONCLUSION

We conclude that the district court properly exercised its equitable powers when it appointed Mr. Wing as receiver, whose actions have not invalidated any of the  Covenant Group's perfected security interests.  In addition, applying the *Wencke* framework,  the Covenant Group cannot at this time demonstrate that the district court must lift the stay as to the Nevada Properties.  Accordingly, we AFFIRM the district court's denial of  the Covenant Group's motion to lift the stay.