**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 9, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

# UNITED STATES COURT OF APPEALS

# TENA TENTH CIRCUIT

SECURITIES AND EXCHANGE
COMMISSION,

     Plaintiff-Appellee,

v.

CURTIS L. DEYOUNG, an individual,

     Defendant-Appellee,

AMERICAN PENSION SERVICES,
INC., a Utah corporation,

     Defendant.

_____

RICHARD SEILER; MICHELLE
SEILER; CHRISTA ZARO,

     Intervenors-Appellants.

_____

FIRST UTAH BANK,

     Interested Party-Appellee,

and

DIANE THOMPSON,

     Receiver-Appellee.

No. 16-4013

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:14-CIV-00309-RJS-DBP)**

Brent D. Wride (Mark W. Pugsley and Jared N. Parrish with him on the briefs), of Ray Quinney & Nebeker P.C., Salt Lake City, Utah, for Richard Seiler, Michelle Seiler, and Christa Zaro, Intervenors-Appellants.

Gary E. Doctorman (Matthew D. Cook and Emily D. Holt with him on the brief), of Parsons Behle & Latimer, Salt Lake City, Utah, for First Utah Bank, Interested Party-Appellee.

Mark R. Gaylord (Melanie J. Vartabedian with him on the brief), of Ballard Spahr LLP, Salt Lake City, Utah, for Receiver-Appellee.

Theodore J. Weiman, Senior Counsel (Anne K. Small, General Counsel, Sanket J. Bulsara, Deputy General Counsel, Michael A. Conley, Solicitor, and Tracey A. Hardin, Assistant General Counsel, with him on the brief), Securities and Exchange Commission, Washington, D.C., for Plaintiff-Appellee SEC.

Before **HOLMES**, **SEYMOUR**, and **MORITZ**, Circuit Judges.

**SEYMOUR**, Circuit Judge.

The Securities and Exchange Commission ("SEC") brought this civil action against American Pension Services ("APS"), a third-party administrator of self-directed individual retirement and 401(k) accounts (collectively "IRA Accounts"), and its President and CEO, Curtis DeYoung. The SEC alleged that DeYoung misappropriated $24 million in APS customer funds that APS had commingled in a Master Trust Account at First Utah Bank ("First Utah"), custodian of the funds.

The district court appointed a Receiver, who ultimately entered into a Settlement Agreement with First Utah. The settlement included a Claims Bar Order, which barred all other claims against First Utah relating to any IRA Accounts established with APS. Three of the approximately 5,500 APS clients (collectively "IRA Account Owners") who had a financial stake in the receivership entity intervened and contended that the court could not bar them from filing their own claims against First Utah. The district court disagreed and approved the settlement. Intervenors appeal, and we affirm.

# I

In 1992, APS requested that First Utah act as custodian for the IRA Accounts it held for the benefit of its IRA Account Owners because APS was not a bank and did not qualify to serve as custodian under the Internal Revenue Code. APS entered into a Custodian Agreement with First Utah that described each of their duties and established a depository account titled the Master Trust Account. APS's CEO, Curtis DeYoung, was the sole signatory with authority to withdraw money from the Master Trust Account.

In 2009, APS and First Utah renewed the 1992 Custodian Agreement. Both custodian agreements delegated to APS the duty to provide all accounting services for IRA Account Owners with respect to their individual accounts with APS. The agreements included an indemnity provision that arguably entitled First

Utah and its officers and directors to indemnity from all claims in connection with APS's performance under the agreements. APS commingled all of the IRA Account Owners' cash into the Master Account at First Utah and maintained all the records reflecting individualized ownership of the IRA Account Owner funds.

The district court found that between 2000 and 2014, DeYoung misappropriated approximately $24 million from the APS investors. In so doing, DeYoung falsified "IRA account statements to assure that the funds missing from the Master Accounts would reconcile with the cash APS reported to be in the IRA Account Owner's [sic] accounts."[1] Aplt. App., vol. 3 at 475, D. Ct. Findings at ¶ 17.

The SEC instituted this action against APS and DeYoung. The district court subsequently appointed a receiver to gather and manage the assets of APS and DeYoung. The Receiver was given the power to, among other things, "pursue, resist and defend all suits, claims and demands which may now be pending or which may be brought by or asserted against the Receivership Estates." *Id.* at ¶ 20 (quoting Order Appointing Receiver).

In May 2014, the Receiver initiated discussions with First Utah regarding its potential liability with respect to the misappropriation of $24 million of IRA

---

[1] Going forward, when referring to facts located in District Court's Findings of Fact, Conclusions of Law, and Order on Motions to Intervene and Approve Settlement with First Utah Bank and for a Claims Bar Order, we will be citing to the specific paragraph number in that document, which is located in volume 3 of the Appellants' Appendix at pages 470 to 498.

Account Owner funds from the Master Account. The Receiver took depositions and had access to APS's records, "including documents, agreements, and records pertaining to the relationship among APS, First Utah, and the IRA Account Owners, and financial information regarding First Utah, including the Written Agreement with the Federal Revenue Bank of San Francisco . . . and insurance policies potentially insuring First Utah." *Id.* at ¶ 29. In furtherance of these discussions, the Receiver provided First Utah with a draft complaint setting forth the nature of the claims the Receiver intended to pursue against First Utah on behalf of APS and for the benefit of the IRA Account Owners. All of the claims, in some form, focused on First Utah's "failure to take necessary steps to assure the IRA Account Owners' deposits were safe." Aplt. App., vol. 2 at 346.

First Utah responded by asserting numerous defenses and counterclaims it intended to argue if the Receiver or any IRA Account Owner filed an action against it based on its role as custodian, including fraudulent inducement by APS and DeYoung, statute of limitations, rescission, comparative negligence, and First Utah's right to indemnification under the 2009 Agreement. The district court noted that "[e]xtensive investigation, discovery and research were conducted regarding the claims and defenses raised by First Utah, Everest [National Insurance Company, First Utah's insurance provider], and the Receiver on behalf of APS." D. Ct. Findings at ¶ 33. Moreover, the district court found the following with regard to the Receiver's claims against First Utah:

35. The Receiver's claims on behalf of APS against First Utah are substantially identical to the claims the IRA Account Owners could assert against First Utah if filed separately. The defenses and counter claims asserted by First Utah in defense of such claims are substantially identical to the defenses and counter claims that could be asserted against the IRA Account Owners claims. The claims are all from the same loss, from the same entities, relating to the same conduct, and arising out of the same transactions and occurrences by the same actors.

36. After several months of arm's length negotiations between the Receiver on behalf of APS and First Utah, and Everest, including three days of mediation with a professional mediator, all under plain view of the SEC, the SEC, the Receiver, First Utah and Everest determined it to be in their respective best interests, to be fair and reasonable, and in the best interests of the Receivership Estate, to resolve the claims, defenses, and counter-claims by entering into the Settlement Agreement.

*Id.* at ¶ ¶ 35, 36. The district court also noted the importance of all parties reaching a settlement in the case:

40. The claims, defenses and counter claims of the Receiver, the IRA Account Owners, the Receivership Estate and First Utah are complex and so inextricably intertwined such that a determination of each party's liabilities and rights independently may be impossible or, at a minimum, impracticable without extensive litigation.

*Id.* at ¶ 40.

With respect to the financial condition of First Utah at the time of the settlement negotiations, the district court found:

51. The Receiver undertook an analysis of the financial condition of First Utah, including reviewing publicly available financial reports and meeting with and discussing First Utah's financial condition with key bank personnel and the Receiver's independent banking consultants.

52. First Utah is a highly regulated, small Utah community bank with only seven branches, all in Salt Lake County, Utah. It has limited capital that it can use to fund its portion of the settlement amount. *See* Written Agreement; financial call reports publicly filed by First Utah with the Utah Department of Financial Institutions.

53. On February 23, 2009, First Utah became subject to a Written Agreement with the Federal Reserve under the Board of Governors Federal Reserve System, Docket No. 09-130-WA-RB-SM. Under the Written Agreement, First Utah was required to increase its capital. While First Utah was recently released from the Written Agreement, it remains under a mandate of its federal regulators to increase its capital. Given First Utah's current capital structure, First Utah's contribution toward settlement, although limited, remains substantial ($2.0 million) in relation to or as a percentage of its total capital. The settlement contribution will also reduce its regulatory capital.

54. According to First Utah's current capital structure, as reflected in the financial call reports publicly filed by First Utah with the Utah Department of Financial Institutions, the payment of $2 million by First Utah toward the settlement will reduce First Utah's capital.

55. In reviewing First Utah's financial condition, the totals of the aggregated claims asserted by the Receiver ($24 million) and indirectly by the Intervenors and the capital available from First Utah to satisfy the maximum amount of such claims, would result in First Utah being unable to pay the claims were the Receiver to prevail.

56. It is also determined that all of the funds realistically available from First Utah are being paid to the Receiver and devoted to the claims—that is the entire $3 million from Everest and $2 million from First Utah, plus the additional consideration.

57. Further, demanding a greater cash contribution from First Utah would reduce capital to an unreasonably low level for regulatory purposes which could negatively impact First Utah's financial stability.

58. In contrast, if the Receiver were to pursue First Utah to

judgment, there is a very real risk that the capital now available for the settlement payments may be exhausted and/or substantially limited ultimately resulting in less potential recovery for the Receivership Estate and the ultimate distribution to IRA Account Owners.

*Id.* at ¶¶ 51-58.

The settlement exceeded $5 million and the bulk of it came from a $2 million contribution from First Utah and a $3 million contribution from Everest.[2] The settlement proceeds were to be distributed to the IRA Account Owners on a pro rata basis. Finally, and most importantly for this case, the settlement was conditioned on the district court entering a Claims Bar Order:

> 63. The payments and releases in the Settlement Agreement are conditioned upon this Court's entry of the Claims Bar Order, permanently barring or enjoining APS, the IRA Account Owners, and their respective affiliates from commencing or continuing any judicial, administrative, arbitration, or other proceeding and/or asserting or prosecuting any claims against First Utah, Everest, and their affiliates, arising out of, in connection with, or relating to any APS self-directed IRA.

*Id.* at ¶ 63.

As to the fairness of the settlement agreement, the district court made the following findings:

> 67. The Court scrutinized the proposed settlement very carefully and did not merely accept the representations of the Receiver.

_____

[2] The Everest insurance policy was a "wasting policy," meaning that "if th[e] case were to be litigated rather than settled, the Everest Policy would first pay defense costs incurred by First Utah and only the remainder, if any, would be available toward satisfaction of a judgment." *Id.* at ¶ 48.

68. Sophisticated parties spent the better part of one year in arm's-length negotiations under the view of the SEC.

69. . . . [B]ecause of the financial condition of First Utah and the very real possibility that protracted litigation may render First Utah unable to satisfy a judgment, it is in the best interest to settle rather than engage in protracted litigation, particularly in light of the wasting nature of the Everest Policy.

. . . .

71. If the claims against First Utah were litigated or allowed to be litigated as a class-action or through multiple individual cases, First Utah would not be willing to settle this case. Moreover, the Everest Policy would be used to pay First Utah's defense costs until the Everest policy limit was depleted and there would be little, if any, insurance proceeds available to satisfy any judgments in favor of the IRA Account Owners.

72. Based on its existing capital structure, First Utah has limited capital to satisfy multiple judgments or settlements with the Receiver and/or IRA Account Owners.

. . . .

75. The SEC has independently approved the terms of the settlement and expressed its view that the settlement is fair and reasonable and in the best interest of the Receivership Estate and the IRA Account Owners.

76. Under the recent Utah Supreme Court case of *Graves v. N. Eastern Servs*., 2015 UT 28, 345 P.3d 619, the intentional misconduct of DeYoung could be compared with the alleged negligence of First Utah and the outcome could impair the ability of the Receiver to recover the missing $24 Million or any significant sum from First Utah.

77. The complex claims and the rights and obligations of the parties, including the IRA Account Owners and Intervenors, are so inextricably intertwined that resolution of the claims independently, as opposed to collectively, would be difficult and inefficient, would

substantially increase costs to the Receivership Estate, and would likely reduce the ultimate recovery to the IRA Account Owners. Specifically, the claims involve the same parties, the same conduct, the same actors, the same transactions and occurrences, the same existence of indemnity claims of First Utah against APS and the IRA Account Owners, and the claims are all from the same loss.

. . . .

83. If the settlement coupled with the Claims Bar Order is not approved, there is a substantial likelihood that the IRA Account Owners will receive a smaller recovery, if any, from First Utah and Everest.

. . . .

86. This settlement offers the highest potential recovery for the Receivership Estate and IRA Account Owners and best method to carry out the Court's mandate to efficiently and economically administer the Receivership Estate.

87. The Court finds the proposed Settlement Agreement is fair, just, and equitable and in the best interest of the Receivership Estate, including creditors of the Estate, such as the IRA Account Owners.

*Id.* at ¶¶ 67-69, 71-72, 75-77, 83, 86-87.

While over 99% of the roughly 5,500 IRA Account Owners approved of the settlement, three did not. These three IRA Account Owners moved to intervene in the action for the limited purpose of objecting to the Claims Bar Order insofar as it prohibited them from filing a separate state court action against First Utah arising out of the transactions between APS and First Utah. Notably, Intervenors do not otherwise object to the settlement, which they concede is "fair, just, equitable and reasonable except for the Claims Bar Order." *Id.* at ¶ 91. The

-10-

district court made the following finding regarding the nature of their claims:

> 45. Recently, three IRA Account Owners filed the Intervenors' Motion, wherein they seek to assert claims directly against First Utah, which claims closely parallel the claims the Receiver identified and notified First Utah she would pursue unless a settlement could be reached. The claims these Intervenors wish to assert are all from the same loss, from the same entities, relating to the same conduct, and arising out of the same transactions and occurrences by the same actors.

*Id.* at ¶ 45.

The district court issued an order approving the settlement and entering the bar order. Because the Claims Bar Order operated as an injunction, it was immediately appealable under 28 U.S.C. § 1292(a)(1). Moreover, the district court certified its order as a final, appealable judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.

**II**

Intervenors appeal, contending (1) the Anti-Injunction Act prohibits an injunction in this case; (2) the district court lacked authority to issue the Claims Bar; and (3) the Claims Bar Order rests on unsupported factual findings. We address each argument in turn.

**1. The Anti-Injunction Act**

Intervenors first argue that the "Claims Bar Order, which permanently enjoins the Account Owners from going forward with their case against First

Utah, is an impermissible injunction against a state court action." Aplt. Br. at 7.
Whether the Anti-Injunction Act prohibits the Claims Bar Order is a question of
law we review de novo. *Ambort v. United States*, 392 F.3d 1138, 1140 (10th Cir.
2004).

> The Anti-Injunction Act provides:
>
> A court of the United States may not grant an injunction to stay
> proceedings in a State court except as expressly authorized by Act of
> Congress, or where necessary in aid of its jurisdiction, or to protect
> or effectuate its judgments.

28 U.S.C. § 2283. The Intervenors contend that the Act is "an absolute
prohibition against enjoining state court proceedings, unless the injunction falls
within one" of three exceptions listed in the Act. Aplt. Br. at 7 (quoting *Atl.
Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 286 (1970)).
They then spend much of their brief arguing that the exceptions to the Anti-
Injunction Act do not apply in this case and therefore, they conclude, the Act
must apply. The Anti-Injunction Act, however, does "not preclude injunctions
against the institution of state court proceedings, but only bar[s] stays of suits
already instituted." *Dombrowski v. Pfister*, 380 U.S. 479, 484 n.2 (1965). It is
undisputed that no state court action was pending in the instant matter at the time
the district court issued its injunction.

Intervenors counter in their reply brief that the only reason there was no
state court action pending was because the district court entered a preliminary
injunction forbidding the IRA Account Owners from filing their lawsuits against

First Utah, concluding that the Anti-Injunction Act is therefore applicable. But Intervenors cite no authority for this argument. The language of the Act is clear and so is the precedent interpreting it: the Act does not apply unless there is a state court proceeding currently in progress. *See* 17 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 4222 at 64 n.19 (citing cases). Accordingly, the Claims Bar Order does not violate the Anti-Injunction Act.[3]

**2. The District Court's Authority to Enter the Claims Bar Order**

Intervenors maintain the district court lacked authority to enter the Claims Bar Order, asserting in part that the Receiver lacked standing to bring the claims of investors. Whether a party has standing is a legal question we review de novo. *Lippoldt v. Cole*, 468 F.3d 1204, 1216 (10th Cir. 2006).

> [T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely

---

[3] Intervenors also contend in their reply brief that because the preliminary injunction was issued without notice or an opportunity to be heard, the district court violated their due process rights. This due process argument was completely absent from Intervenors' opening brief, and "[i]t is well settled that '[t]his court does not ordinarily review issues raised for the first time in a reply brief.'" *United States v. Gordon*, 710 F.3d 1124, 1150 (10th Cir. 2013) (quoting *Stump v. Gates*, 211 F.3d 527, 533 (10th Cir. 2000)). "Even then, the arguments are presented in a perfunctory and conclusory fashion, and we are rightly hesitant to definitively opine on such legally significant issues when they have received such cursory treatment." *Id.* We decline to address the due process argument.

speculative, that the injury will be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000).

For their standing argument, Intervenors maintain that "[t]he Account Holders' claims belong exclusively to [the individual Account Holders] and cannot be asserted by the Receiver." Aplt. Br. at 16. As support, they rely on *Liberte Capital Group, LLC v. Capwill* (*Liberte II*), 248 F. App'x 650 (6th Cir. 2007) (unpublished), for the proposition that a "receiver lacks standing to institute an action on behalf of investors in the corporation." Aplt. Br. at 17 (quoting *Liberte II*, 248 F. App'x at 656 (citing 13 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 66.08[1][b] (3d ed. 2005))). We disagree with Intervenors' proposition that *Liberte II* is dispositive, or even relevant.

*Liberte II* involved Liberte Capital Group and Alpha Capital Group, both of which marketed viatical life insurance policies[4] to investors. *Liberte Capital Group, LLC v. Capwill* (*Liberte I*), 462 F.3d 543, 547 (6th Cir. 2006). Both Alpha and Liberte used Viatical Escrow Services (VES) to provide trustee services in handling monies received from investors to buy policies and to service

---

[4] A viatical life insurance policy is an investment where one person purchases another person's life insurance policy at a price that is less than the death benefit of the policy, and the purchaser collects the death benefit when the seller dies. *See* Joseph M. Belth, *Viatical and Life Settlement Transactions*, CONTINGENCIES, Mar./Apr. 2002, at 22-25.

premium payments over time. *Id.* A fourth company, Capwill Fund Leasing (CFL), in its capacity as escrow agent and fiduciary, invested the monies VES obtained. *Id.* In 1999, Liberte sued VES and CFL, alleging that they misappropriated escrow funds. *Id.* "The district court appointed a receiver 'to oversee and to administer the business and assets of VES and CFL . . . [and] to take and maintain exclusive and complete custody, control and possession of all the assets belonging to VES and CFL.'" *Liberte II*, 248 F. App'x at 652.

In separate matters, a few individual investors filed arbitration claims against the broker-dealers who sold them Liberte viaticals. *Id.* The investors alleged the broker-dealers' representatives fraudulently induced them to purchase Liberte viaticals. *Id.* Three of these investors intervened in the receivership action and sought a declaration that their arbitration claims belonged to them, not to the receivership estate. The receiver argued that any proceeds recovered by the individuals were assets of the receivership estate. *Id.* at 653. The investors countered that the receiver lacked standing to bring such claims. *Id.* The district court disagreed and granted summary judgment to the receiver on the merits. *Id.* at 655, 665.

The Sixth Circuit reversed on standing, emphasizing that the receiver could not "show that the receivership entities suffered an 'injury in fact' that [was] 'fairly traceable' to the actions of [the broker-dealers]." *Id.* at 655. "Nor [could] the [receiver] show that the receivership entities ha[d] a 'personal stake' in the

-15-

outcome of the controversy involving the [broker-dealers]." *Id*. at 655-56.

Accordingly, the court held the receiver lacked standing to sue. *Id.* at 656. As

the Sixth Circuit explained three years later:

> The Receiver's standing problem in *Liberte* was that none of the receivership entities—VES, CFL, Capwill or Liberte—would have had standing to sue Liberte's brokers for the misrepresentations the brokers made to Liberte's investors, because none of the entities would have been able to claim any tangible injury traceable to the brokers' misrepresentations to the investors. Because the receivership entities all would have lacked standing, and because of the rule that receivers' rights are limited to those of the receivership entities, the Receiver also lacked standing.

*Wuliger v. Mfr's Life Ins. Co.*, 567 F.3d 787, 794 (6th Cir. 2009).

In contrast to the receiver in *Liberte II*, the Receiver in this case has

standing to sue First Utah because the receivership entity, APS, had standing to

bring such an action. For example, the Receiver, in negotiating the settlement on

behalf of APS, drafted a complaint against First Utah alleging that the IRA

Account Owners "agreed to have the Bank act as custodian/trustee of their IRA

accounts, while APS provided administrative services to their self-directed IRAs."

Aplt. App., vol. 2 at 344-45. It further alleged that First Utah had contractual and

fiduciary duties which it violated, leading to the misappropriation of

approximately $24 million from the commingled master trust account into which

APS had deposited the funds. *Id*. at 345. By delegating its custodial and

administrative duties to DeYoung, the draft complaint alleged, DeYoung was able

to "fraudulently pilfer[] millions from the commingled master trust accounts." *Id.*

-16-

"Had First Utah performed their duties, they would have discovered the misappropriation." *Id.* As illustrated, the Receiver has standing because APS suffered an injury in fact (its own insolvency), which is fairly traceable to First Utah because allegedly First Utah negligently performed its duties as custodian, and the wrong can be redressed by a court order requiring First Utah to reimburse APS for First Utah's negligence.

We next turn to Intervenors' contention that the district court erred by entering the Claims Bar Order. In challenging the propriety of the bar order, Intervenors have "the weighty burden of showing an abuse of discretion." *Commodity Futures Trading Comm'n v. Chilcott Portfolio Mgmt., Inc.*, 713 F.2d 1477, 1484 (10th Cir. 1983) (reviewing for abuse of discretion district court's order staying all claims against equity receiver). "It is generally recognized 'that the district court has broad powers and wide discretion to determine . . . relief in an equity receivership.'" *SEC v. Vescor Capital Corp.*, 599 F.3d 1189, 1194 (10th Cir. 2010) (citation omitted). "This discretion derives from the inherent powers of an equity court to fashion relief." *Id.*

There are no cases from this court directly addressing a Claims Bar Order like the one at issue here. As the Fifth Circuit has recognized, "because this is a case in *equity*, it is neither surprising nor dispositive that there is no case law directly controlling the district court's bar order." *SEC v. Kaleta*, 530 F. App'x 360, 362 (5th Cir. 2013) (unpublished); *see also Chilcott*, 713 F.2d at 1484 ("That

-17-

the appealed order is apparently unique in its context is not, of course, dispositive."). Although we have not addressed the issue, we find the Fifth Circuit's treatment of a claims bar in *SEC v. Kaleta* persuasive.

In *Kaleta*, the district court approved a settlement between a court-appointed receiver and third parties who were closely affiliated with the receivership entities. 530 F. App'x at 361-62. As part of the settlement, the district court entered a Claims Bar Order enjoining other investors from commencing any legal action against the third party entities arising from the underlying fraud. *Id.* at 362. A subset of investors challenged the district court's entry of the bar order, but the Fifth Circuit affirmed. *Id.* Recognizing that a district court has wide discretion to determine the appropriate relief, the court reviewed the factors the district court considered. It noted that there would have been no settlement without the bar order and that "the settlement expressly permit[ted] Intervenors and other investors to pursue their claims by 'participat[ing] in the claims process for the Receiver's ultimate plan of distribution for the Receivership Estate.'" *Id.* (second alteration in original).

Similarly, in this case, the district court carefully evaluated numerous factors that led to its decision to enter a claims bar. First, like the third parties in *Kaleta*, the court determined that First Utah would not have settled without the Claims Bar Order. Second, as noted above, the court found that First Utah's liability was not the only factor the Receiver considered and that "because of the

-18-

financial condition of First Utah and the very real possibility that protracted litigation may render First Utah unable to satisfy a judgment, it [was] in the best interest to settle rather than engage in protracted litigation." D. Ct. Findings at ¶ 69. Third, the court considered that First Utah was settling to avoid protracted litigation and that First Utah would not be willing to admit any wrongdoing if claims against it were allowed to be litigated as a class action or through multiple individual cases.

Fourth, $3 million of the $5 million settlement amount came from First Utah's insurance policy with Everest National Insurance Company, and if the case against First Utah were to be litigated, the Everest policy would first be used to pay First Utah's defense costs, which would most likely exhaust the policy and reduce the amount that would otherwise be available to the IRA Account Owners. Fifth, the district court noted that approximately "99.98% of the IRA Account Owners did not object" to the settlement. *Id.* at ¶ 92. Thus, the vast majority of individuals who would be affected by the settlement believed it to be fair. The court also considered that victory in a lawsuit against First Utah was not certain because First Utah would respond by "asserting numerous defenses and counter claims . . . if the Receiver or any other person filed an action based on its role as custodian of APS and the IRA Accounts, including statute of limitations, fraudulent inducement, rescission, comparative negligence." *Id*. at ¶ 32. And, most importantly, First Utah had a right to indemnification from APS under the

1992 and 2009 Custodian Agreements. *Id*. The indemnification provision could force APS to indemnify First Utah for claims brought against it by IRA Account Owners, which would reduce the amount the IRA Account Owners could recover from APS.

Accordingly, the district court found that the settlement offered the highest potential recovery for the Receivership Estate and the IRA Account Owners, and that the Claims Bar Order was necessary to that settlement. While a Claims Bar Order may not be appropriate in all cases, we are persuaded that the district court did not abuse its discretion by entering one in this case.[5]

### 3. **The District Court's Factual Findings**

Intervenors' last objection to the Claims Bar Order is that it rests on unsupported factual findings. Specifically, Intervenors object only to the following two findings of fact:

---

[5] We are further persuaded by the fact that numerous district courts have entered a claims bar order similar to the one entered in this case. *See, e.g., SEC v. Alleca*, 1:12-cv-3261-WSD, 2015 WL 11199076 (N.D. Ga. Oct. 15, 2015); *SEC v. Stanford Int'l Bank, Ltd*, No. 3:09-CV-0298-N, 2015 WL 10845785 (N.D. Tex. Sept. 23, 2015); *SEC v. Kaleta*, No. 4:09-3674, 2012 WL 401069 (S.D. Tex. Feb. 7, 2012); *Harmelin v. Man Fin. Inc.*, Nos. 06-1944, 05-2973, 2007 WL 4571021 (E.D. Pa. Dec. 28, 2007); *Commodity Futures Trading Comm'n v. Equity Fin. Grp.*, Civil No. 04-1512 (RBK), 2007 WL 2139399 (D.N.J. July 23, 2007); *SEC v. Capital Consultants, LLC*, No. Civ.00-1290-KI, 2002 WL 31470399 (D. Or. Mar. 8, 2002). Moreover, the Sixth Circuit, in *Gordon v. Dadante*, 336 F. App'x 540, 551 (6th Cir. 2009), affirmed a settlement similar to the one here that included a bar order, although the authority of the district court to enter such an order was not a basis for the appeal.

56. It is also determined that all of the funds realistically available from First Utah are being paid to the Receiver and devoted to the claims—that is the entire $3 million from Everest and $2 million from First Utah, plus the additional consideration.

57. Further, demanding a greater cash contribution from First Utah would reduce capital to an unreasonably low level for regulatory purposes which could negatively impact First Utah's financial stability.

*Id*. at ¶¶ 56-57. "A finding of fact is clearly erroneous if it is without factual support in the record or if, after reviewing all the evidence, we are left with a definite and firm conviction that a mistake has been made." *Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d 1297, 1305 (10th Cir. 2015) (citation omitted). That standard has not been met here.

As we set out fully above, the district court made extensive findings regarding First Utah's financial status determining, in particular, that "[t]he Receiver undertook an analysis of the financial condition of First Utah, including reviewing publicly available financial reports and meeting with and discussing First Utah's financial condition with key bank personnel and the Receiver's independent banking consultants." D. Ct. Findings at ¶ 51. The court emphasized that First Utah is "a highly regulated, small Utah community bank" and "has limited capital that it can use to fund its portion of the settlement amount." *Id.* at ¶ 52. Notably, First Utah "remains under a mandate of its federal regulators to increase its capital." *Id*. at ¶ 53. Moreover, the district court found that, without the settlement, the Everest Policy, which accounts for $3 million of the

settlement, "would [have been] used to pay First Utah's defense costs until the Everest policy limit was depleted and there would be little, if any, insurance proceeds available to satisfy any judgments of the IRA Account Owners." *Id.* at ¶ 71.

The district court further stated that "[b]ased on its existing capital structure, First Utah has limited capital to satisfy multiple judgments or settlements with the Receiver and/or IRA Accounts Owners." *Id.* at ¶ 72. Lastly, further supporting the court's findings in paragraphs 56 and 57, the Settlement Agreement discusses the Receiver's investigation into First Utah's financial situation and her conclusion that First Utah's $2 million contribution was the most it could pay without risking undercapitalization. *See* Aplt. App., vol. 2 at 183. Although Intervenors' expert contended to the contrary in his Declaration, concluding that First Utah could have paid an additional $1 to $3 million without the risk of undercapitalization, the district court had the exclusive function of determining the weight to give to the expert's Declaration.[6] *See Holdeman v. Devine*, 572 F.3d 1190, 1192 (10th Cir. 2009). Thus, it was perfectly acceptable for the district court to disregard the testimony of Intervenors' expert.

---

[6] First Utah noted that Intervenors never moved to have their expert, Mr. McGregor, qualified as such and contends the McGregor Declaration did not meet the requirements of expert testimony under FRE 702. Mr. McGregor's classification as an expert does not impact our determination that the district court was free to disregard his testimony.

Given all of these facts, we are not persuaded that the two disputed findings of fact are clearly erroneous. Moreover, Intervenors' contention that "without [findings 56 and 57], there is no justification for the extraordinary relief granted" by the district court, Aplt. Br. at 22, is simply incorrect. Even without those two findings, there are more than enough factual findings to support the district court's order approving the settlement. As First Utah pointed out in its brief,

> the need to preserve the assets and operational capacity of the defendant so as not to collapse a financial institution or other defendant are proper considerations of the Court. *See Baker v. Wash. Mut. Fin. Grp., LLC*, 193 F. App'x 294, 297-98 (5th Cir. 2006). Intervenors do not assert that First Utah could pay more while preserving its operational capacity or that its regulators would even approve a higher settlement. The Intervenors' allegation that First Utah could pay more, even if true, does not support overturning the settlement.

Aple. First Utah Br. at 24.

We AFFIRM.