# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

December 19, 2019

Lyle W. Cayce
Clerk

No. 17-11073

————

ANTONIO JUBIS ZACARIAS; ROBERTO BARBAR

 Plaintiffs - Appellants

v.

STANFORD INTERNATIONAL BANK, LIMITED

 Defendant

BARRY L. RUPERT; CAROL RUPERT; MICHAEL RISHMAGUE; LIONEL ALESSIO; DAN AULI PANOS, et al

 Movants - Appellants

v.

OFFICIAL STANFORD INVESTORS' COMMITTEE; MANUEL CANABAL; WILLIS, LIMITED; WILLIS OF COLORADO, INCORPORATED,

 Interested Parties - Appellees

WILLIS GROUP HOLDINGS LIMITED; WILLIS NORTH AMERICA, INCORPORATED; AMY S. BARANOUCKY; BOWEN MICLETTE; BRITT, INCORPORATED; RALPH S. JANVEY; SAMUEL TROICE,

 Appellees

v.

EDNA ABLE,

 Interested Party – Appellant

----------------------

Nos. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

CONSOLIDATED WITH 17-11114

THE OFFICIAL STANFORD INVESTORS' COMMITTEE; SAMUEL TROICE, on their own behalf and on behalf of a class of all others similarly situated; MANUEL CANABAL, on their own behalf and on behalf of a class of all others similarly situated,

 Plaintiffs - Appellees

v.

CARLOS TISMINESKY; ROBERTO BARBAR; ANA LORENA NUILA DE GADALA-MARIA,

 Plaintiffs - Appellants

v.

WILLIS OF COLORADO, INCORPORATED; WILLIS LIMITED; WILLIS GROUP HOLDINGS LIMITED; WILLIS NORTH AMERICA, INCORPORATED; AMY S. BARANOUCKY; BOWEN, MICLETTE; BRITT, INCORPORATED,

 Defendants - Appellees

v.

BARRY L. RUPERT; CAROL RUPERT; MICHAEL RISHMAGUE; LIONEL ALESSIO; DAN AULI PANOS, EDNA ABLE; et al,

 Appellants

v.

RALPH S. JANVEY, in his Capacity as Court-Appointed Receiver for Stanford Receivership Estate,

 Appellee

2

Nos. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

----------------------
CONSOLIDATED WITH 17-11122

EDNA ABLE; ROBERT C. AHDERS; RODRIGO RIVERA ALCAYAGA;
DAVID ARNTSEN; CARLIE ARNTSEN; ET AL,

 Plaintiffs - Appellants

v.

WILLIS OF COLORADO, INCORPORATED; WGH HOLDINGS, LTD.;
WILLIS LTD.,

 Defendants - Appellees

-----------------------
CONSOLIDATED WITH 17-11127

ANTONIO JUBIS ZACARIAS, Individual; ANA VIRGINIA GONZALEZ DE
JUBIS, Individual; GLADIS JUBIS DE ACUNA, Individual; ERIC ACUNA
JUBIS, Individual; TULIO CAPRILES, Individual; JORGE CASAUS
HERRERO, Individual; MARTHA BLANCHET, Individual; LUIS ZABALA,
Individual; EMMA LOPEZ, Individual; ELBA DE LA TORRE, Individual,

 Plaintiffs - Appellants

v.

WILLIS LIMITED; WILLIS OF COLORADO, INCORPORATED,

 Defendants – Appellees

3

Nos. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

----------------------
CONSOLIDATED WITH 17-11128

ANA LORENA NUILA DE GADALA-MARIA, Individual; JOSE NUILA, Individual; JOSE NUILA FUENTES, Individual; GLADYS BONILLA DE NUILA, Individual; GLADYS ELENA NUILA DE PONCE, Individual, et al

 Plaintiffs - Appellants

v.

WILLIS LIMITED, a United Kingdom Company; WILLIS OF COLORADO, INCORPORATED, a Colorado Corporation

 Defendants - Appellees

----------------------
CONSOLIDATED WITH 17-11129

CARLOS TISMINESKY, Individual; RACHEL TISMINESKY, Individual; FELIPE BRONSTEIN, Individual; ETHEL TISMINESKY DE BRONSTEIN, Individual; GUY GERBY, Individual; VICENTE JUARISTI SUAREZ, Individual; AMPARO MATEO LONGARELA, Individual; SALVADOR GAVILAN, Individual; LARRY FRANK, Individual; MERCEDES BITTAN, Individual; OMAIRA BERMUDEZ, Individual,

 Plaintiffs - Appellants

v.

WILLIS LIMITED; WILLIS OF COLORADO, INCORPORATED,

 Defendants – Appellees

4

Nos. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

Appeals from the United States District Court
for the Northern District of Texas

PETITION FOR REHEARING

Before HIGGINBOTHAM, GRAVES, and WILLETT, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Treating the Petition for Rehearing En Banc as a petition for panel rehearing, the petition is GRANTED. We withdraw the opinions of July 22, 2019,[1] and substitute the following opinions:

## I.

The Securities and Exchange Commission filed a complaint in the Northern District of Texas against Robert Allen Stanford, the Stanford International Bank, and other Stanford entities, alleging "a massive, ongoing fraud." Invoking the court's long-held statutory authority, the Commission requested that the district court take custody of the troubled Stanford entities and delegate control to an appointed officer of the court. The court did so, appointing Ralph Janvey as receiver to "collect" and "marshal" assets owed to the Stanford entities, and to distribute these funds to their defrauded investors to honor commitments to the extent the receiver's efforts recouped monies from the Ponzi-scheme players.

The receiver has pursued persons and entities allegedly complicit in Stanford's Ponzi scheme. Through settlements with these third parties, the

---

[1] 931 F.3d 382.

Nos. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

receiver retrieved investment losses, which it then distributed pro rata to investors through a court-supervised distribution process. Four years into this ongoing process, the receiver sued two insurance brokers, not upon contracts of insurance, but for participating in the Ponzi scheme. As with the receiver's other suits, monies it recovered from this suit would be distributed by the receiver pro rata to investor claimants. After years of litigation, the two companies, negotiating for complete peace, agreed to settle conditioned on bar orders enjoining further Ponzi-scheme suits filed against them. The district court entered the bar orders and approved the settlements. Certain objectors bring this appeal challenging the district court's jurisdiction and discretion to enter the bar orders. We affirm.

## II.

## A.

The story is well known. Under the operation of Robert Allen Stanford, the Antigua-based Stanford International Bank issued certificates of deposit (SIB CDs) and marketed them throughout the United States and Latin America.[2] Stanford's financial advisors promoted SIB CDs by blurring the line between the Antiguan bank and Stanford's United States-based financial advisors, creating the impression that SIB CDs were better protected than similar investments backed by the Federal Deposit Insurance Corporation. Stanford trained its brokers to assure potential investors that the Bank's investments were highly liquid and achieved consistent double-digit annual returns, all under the protection of extensive insurance coverage.

---

[2] *United States v. Stanford*, 805 F.3d 557, 563–65 (5th Cir. 2015).

Nos. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

Here, the receiver alleges that, to support their marketing activities, the Stanford entities purchased insurance policies with the assistance of their insurance brokers, Bowen, Miclette & Britt, Inc. (BMB) from the 1990s and Willis from 2004. In their marketing materials, Stanford entities then touted insurance policies covering the Bank presenting the Bank's unique insurance coverage, describing a gauntlet of audits and risk analyses the Bank passed to satisfy its insurers, and perpetuating the impression that Bank deposits were fully insured. They were distributed widely and sent routinely to Stanford's client base.

BMB and Willis also provided letters for Stanford financial advisors. These letters described the Stanford International Bank's management as "first class business people" and claimed the brokers "placed" Lloyd's of London insurance policies for the Bank. The letters and promotional materials did not disclose the policies' true coverage. These were the joint product of Stanford and the insurance brokers. Stanford employees drafted the letters, which Willis and BMB then placed on their own letterhead. The connections between Stanford and the defendants ran deep: BMB's letters were signed by a BMB "financial specialist" who was also a Stanford board member.[3] Stanford brokers then sent these letters to current and prospective investors.

The letters were a key part of the successful marketing efforts that drove the Ponzi scheme, as insurance played a central role in the Bank's overall

---

[3] *See, e.g.*, BMB Letter at 7–8, *Sec. & Exch. Comm'n v. Stanford Int'l Bank Ltd.*, No. 3:09-CV-00298-N (N.D. Tex. Dec. 29, 2016), ECF No. 2465-6 (signed by Robert S. Winter); *see also Certain Underwriters at Lloyd's of London v. Winter*, No. 3:15-CV-01997-N, 2015 WL 12732628, at *1 (N.D. Tex. Nov. 4, 2015) ("Before his death in 2014, Robert S. Winter was a Director of Stanford International Bank, Ltd. ('SIBL') from 1998 to 2009.").

Nos. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

attractiveness to investors. Prospective investors who viewed the letters, as well as the Bank's client base more generally, were drawn to the combination of relatively high rates of return and purportedly comprehensive insurance coverage. Over two decades, the Bank issued more than $7 billion in SIB CDs to investors.

Maturing CDs were redeemed with the funds of new investors.[4] Deposits were meanwhile commingled and allocated to illiquid investments, primarily in Antiguan real estate—a portfolio monitored not by a team of professional analysts, but by only two individuals, Robert Allen Stanford and James Davis, the Bank's chief financial officer. BMB and Willis had performed insurance assessments on all aspects of Stanford's businesses, such that they enjoyed full understanding of operations. As a result, the brokers knew that SIB CDs financed an illiquid real-estate fund and that the quality and risk of the underlying investments had not been disclosed to investors. Moreover, on the Bank's behalf, the brokers had procured insurance policies that provided no meaningful coverage of deposits in the Bank. When the Ponzi scheme collapsed, $7 billion in deposits were protected by $50 million in insurance coverage. Presenting as a legitimate enterprise, it was nothing but a single, massive fraudulent scheme.

## B.

The Stanford Ponzi scheme collapsed in the wake of the 2008 financial crisis, when the stream of new depositors ran dry.[5] 18,000 investors in SIB CDs lost around $5 billion. On February 17, 2009, the SEC filed a complaint

---

[4] *Stanford*, 805 F.3d at 564.

[5] *Id.*

against Robert Allen Stanford, the Bank, and other Stanford entities, alleging, inter alia, violations of the Securities Act of 1933, the Securities Exchange Act of 1934 and Rule 10b-5, and the Investment Company Act of 1940. The SEC sought an injunction against continued violations of the securities laws, disgorgement of illegal proceeds of the fraudulent scheme, a freeze of Stanford assets, and a federal court order placing the Stanford entities into a receivership.

The district court appointed Ralph Janvey as receiver, with authority to take immediate, complete, and exclusive control of the Stanford entities and to recover assets "in furtherance of maximum and timely disbursement . . . to claimants."[6] The district court's Receivership Order enjoined all persons from "[t]he commencement or continuation . . . of any judicial, administrative, or other proceeding against the Receiver, any of the defendants [in the SEC action, such as Robert Allen Stanford and the Bank], the Receivership Estate, or any agent, officer, or employee related to the Receivership Estate, arising from the subject matter of this civil action," as well as from "[a]ny act to collect, assess, or recover a claim against the Receiver or that would attach to or encumber the Receivership Estate." The district court appointed an examiner to investigate and "convey to the Court such information as . . . would be helpful to the Court in considering the interests of the investors in any financial products, accounts, vehicles or ventures sponsored, promoted or sold by" the Stanford entities, and to serve as chair of the Official Stanford Investors'

---

[6] The 2009 Receivership Order was subsequently amended in 2010 and remained identical in all relevant parts.

Nos. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

Committee to represent investors in the Stanford International Bank and to prosecute claims against third parties as assigned by the receiver.

The district court approved a process by which Stanford investors could file claims against the Stanford entities with the receiver and, if approved, participate in distributions of the receivership's assets. The order set a deadline of 120 days for claimants to submit proofs of claim against the receivership entities. The receiver would evaluate the claims, subject to an appeal process and judicial review in the district court. Would-be claimants who failed to submit claims by the deadline were enjoined from later asserting claims against the receivership and its property. The court ordered the receiver to provide notice of the deadline to all "Stanford International Bank, Ltd. certificate of deposit account holders who had open accounts as of February 16, 2009 and for whom the Receiver has physical addresses from the books and records of Stanford International Bank, Ltd." The court also ordered the receiver to publish notice on its website and in the *New York Times*, *Wall Street Journal*, *Financial Times*, *Houston Chronicle*, and newspapers in the British Virgin Islands, Antigua, and Aruba.

Of the Plaintiffs-Objectors, 477 of 509—approximately 94 percent—have and will continue to recover as claimants in the receivership's distribution process.[7] While the record does not reflect why the remaining 32 Plaintiffs-Objectors did not timely submit claims, they constitute less than two-tenths of one percent of the total 18,000 defrauded SIB CD investors.[8]

---

[7] Of the 509 Plaintiffs-Objectors, 455 are confirmed claimants; 22 are claimants with the Antiguan liquidators and by agreement are treated as claimants by the receiver.

[8] Many of these 32 could not be confirmed as SIB CD investors by the receiver.

Nos. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

**C.**

The receiver identified and pursued persons and entities as participants in the Ponzi scheme to recover funds for distribution to investor-claimants. Armed with a receiver's authority to provide total peace, it sued and settled with, among others, an accounting firm, BDO USA LLC, for $40 million; the Adams & Reese law firm and other individuals for around $4 million; and consultant Kroll LLC and its affiliate for $24 million. With each settlement, the district court entered a bar order requested by the parties, enjoining related claims against the defendants arising out of the Stanford Ponzi scheme. Receivership claimants, including Plaintiffs-Objectors, with approved claims recovered pro rata from the funds gathered in these receivership actions without challenge to the bar orders.

Five months after the appointment of the receiver, individual investor Samuel Troice and other investors sued in the district court seeking certification of a class of SIB CD investors against BMB and Willis of Colorado and related entities ("the Original Troice Action").[9] The action sought recovery of their losses from the Ponzi scheme under the Texas Securities Act and theories of negligence and fraud. In 2011, the district court dismissed the case, holding that the claims were precluded by the Securities Litigation Uniform Standards Act (SLUSA). This Court reversed in a consolidated appeal,[10] and the Supreme Court affirmed in *Chadbourne & Parke LLP v. Troice*.[11] The Supreme Court held that SLUSA's prohibition on state-law class actions

---

[9] In December 2009, the Troice Plaintiffs' case was consolidated with a similar action filed by SIB CD investor Manuel Canabal.

[10] *Roland v. Green*, 675 F.3d 503, 524 (5th Cir. 2012).

[11] 571 U.S. 377, 395–97 (2014).

11

Nos. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

alleging fraud in "the purchase or sale of a covered security" did not preclude the claims regarding the purchase or sale of SIB CDs, which were not publicly traded and thus not "covered" for SLUSA purposes.[12] The case was remanded to district court for further proceedings.[13]

In October 2013, Troice and another individual investor, Manuel Canabal, joined the receiver's prosecution of a case against the same insurance brokers. Together with these two individuals and the Investors' Committee, the receiver filed a complaint against Willis of Colorado and its affiliates[14] and a month later amended the complaint to add claims against BMB.[15] The

---

[12] *Id.*

[13] In November 2012, Troice and two other individual investors joined the receiver and Investors' Committee in an action bringing investor class claims and receivership estate claims against Stanford's lawyers at the Greenberg Traurig firm. Complaint, *Janvey v. Greenberg Traurig, LLP*, No. 3:12-cv-04641-N-BQ (N.D. Tex. Nov. 15, 2012), ECF No. 1. On the defendants' motion for judgment on the pleadings, the district court held that under Texas's attorney-immunity doctrine it lacked jurisdiction over the investor-plaintiffs' class claims, since these plaintiffs were non-clients and the conduct at issue occurred within the scope of the attorney's representation of a client. *Official Stanford Investors Comm. v. Greenberg Traurig, LLP*, 2017 WL 6761765, at *3 (N.D. Tex. Dec. 5, 2017). The district court dismissed Troice's and the other investor plaintiffs' claims against Greenberg Traurig, allowing the receiver and Investors' Committee to proceed on the estate claims. *Id.* Troice and the investor plaintiffs appealed, and this court affirmed. *Troice v. Greenberg Traurig, LLP*, 2019 WL 1648932, at *1 (5th Cir. Apr. 17, 2019). The receiver and Investors' Committee did not participate in the appeal.

[14] In a related case, the plaintiffs also brought and settled claims against Amy Baranoucky, the Stanford entities' Client Advocate within Willis. *Janvey v. Willis of Colo., Inc.*, No. 3:113-cv-03980-N-BQ (N.D. Tex. Aug. 23, 2017), ECF No. 134.

[15] They also brought and settled claims against Robert Winter, the BMB insurance specialist who served on the board of the Stanford International Bank. Notice of Settlement, *Janvey v. Greenberg Traurig, LLP*, No. 3:12-cv-04641-N-BQ (N.D. Tex. Nov. 7, 2016), ECF No. 220.

receiver and the Investors' Committee sought to recover losses from the Ponzi-scheme on behalf of the estate under six theories:[16]

(1) that Willis and BMB knowingly or recklessly aided, abetted, or participated in the Stanford directors' and officers' breaches of fiduciary duties towards the receivership entities, resulting in exponentially increased liabilities and the misappropriation of billions of dollars;

(2) that Willis and BMB violated their duty of care towards the receivership entities by enabling and participating in the Stanford directors' and officers' Ponzi scheme, resulting in exponentially increased liabilities and the misappropriation of billions of dollars;

(3) that Willis and BMB were unjustly enriched by proceeds of the Ponzi scheme paid out to them by Stanford's directors and officers—transfers made with the intent to hinder, delay, or defraud the receivership entities; [17]

(4) that Willis and BMB knowingly or recklessly aided, abetted, or participated in the Stanford directors' and officers' fraudulent transfers of receivership entities' assets to third parties, including Stanford's insurers, the recipients of Stanford's investments in ventures and real estate, and Allen Stanford himself, with the intent to hinder, delay, or defraud the receivership entities;

---

[16] The Troice Plaintiffs attacked the Ponzi scheme with claims for violations of the Texas Securities Act ("TSA"); aiding and abetting violations of the TSA; participation in a fraudulent scheme; civil conspiracy; violations of the Texas Insurance Code ("Insurance Code"); common law fraud; negligent misrepresentation; negligence/gross negligence; and negligent retention/negligent supervision.

[17] This claim is asserted by the Investors' Committee.

(5) that Willis and BMB breached their duties of care to the receivership entities in their hiring, supervision, and retention of employees who issued comfort letters in furtherance of the Stanford Ponzi scheme, causing exponentially increased liabilities and the misappropriation of billions of dollars;

(6) that Willis and BMB conspired with Stanford directors and officers to use insurance as a marketing tool to sell SIB CDs in furtherance of the Ponzi scheme, harming the receivership entities. The district court dismissed this civil conspiracy claim, however, holding that the receiver and the Investors' Committee failed to allege the requisite state of mind to sustain the claim.

In March 2014, the district court consolidated the Receivership Action and the Original Troice Action for purposes of discovery, keeping the cases on separate dockets.

**D.**

Individual investors filed three separate lawsuits against BMB and Willis, seeking to recover their Ponzi scheme losses. On February 14, 2013, five groups of individual investors (collectively "the Florida Plaintiffs-Objectors") filed lawsuits against Willis in a Florida state court, seeking compensation for their alleged Ponzi-scheme losses, in excess of $130 million, under common law theories of negligence and fraud. Willis removed these cases to federal court, where they were transferred to Judge Godbey in the Northern District of Texas. The district court remanded one of the cases to Florida state court for lack of diversity, subject to a stay, and kept the remaining cases.

Nos. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

In 2009 and 2011, two groups of individual investors ("the Texas Plaintiffs-Objectors" collectively) filed lawsuits against Willis and BMB in Texas state court,[18] seeking recovery of their alleged Ponzi-scheme losses, in excess of $88 million under the Securities Act of 1933, the Texas Insurance Code, the Texas Securities Act, the Colorado Consumer Protection Act, and common-law theories of negligence and fraud. Willis and BMB removed these cases to federal court, where they were transferred to Judge Godbey. In both cases, the district court granted plaintiffs' motions for remand based on procedural defects in removal,[19] but also held that the plaintiffs had violated the Receivership Order's injunction against suits encumbering receivership assets.[20] It held that the cases would remain stayed on remand under the terms of the Receivership Order because, "to the extent Defendants are ever held liable, any proceeds of the claim are potential receivership assets . . . . The Court will not condone or allow Stanford investors to race for Receivership assets as the Plaintiffs attempt to do here."[21] In the second of these cases, the plaintiffs appealed the district court's refusal to lift the litigation stay, and this Court affirmed, recognizing "[']the importance of preserving a receivership court's ability to issue orders preventing interference with its administration of the receivership property.'"[22]

---

[18] *Rupert v. Winter*, 2012 WL 13102348, at *1 (N.D. Tex. Jan. 24, 2012); *Rishmague v. Winter*, 2014 WL 11633690, at *1 (N.D. Tex. Sept. 9, 2014), *aff'd*, 616 F. App'x 138 (5th Cir. 2015).

[19] *Rupert*, 2012 WL 13102348 at *3–4; *Rishmague*, 2014 WL 11633690 at *2.

[20] *Rupert*, 2012 WL 13102348 at *7; *Rishmague*, 2014 WL 11633690 at *3.

[21] *Rupert*, 2012 WL 13102348 at *9; *Rishmague*, 2014 WL 11633690 at *4.

[22] *Rishmague v. Winter*, 616 F. App'x 138, 139 (5th Cir. 2015) (unpublished) (quoting *Schauss v. Metals Depository Corp.*, 757 F.2d 649, 654 (5th Cir.1985)).

Nos. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

Finally, in 2016, a group of Stanford investors ("the Able Plaintiffs-Objectors") filed a suit against Willis in the Northern District of Texas under common law and statutory theories, seeking recovery of their alleged Ponzi-scheme losses in excess of $135 million.[23]

**E.**

Meanwhile, the receiver and Investors' Committee continued prosecuting their claims against Willis and BMB. After years of litigation, thousands of hours of investigating the claims, and two mediations, the parties to the Receivership Action agreed to terms of settlement—a release of claims against BMB for $12.85 million and Willis for $120 million, all to be paid into the receivership and distributed to receivership claimants who held SIB CDs as of February 2009. Both BMB and Willis conditioned their agreement on global resolution of claims arising out of the Stanford Ponzi scheme. Specifically, they conditioned agreement on the district court entering bar orders enjoining Stanford-Ponzi-scheme-related claims against them. Troice and Canabal do not challenge the settlement, and release any claims except their right to participate in the distribution of the receivership.

In November 2016, the district court gave notice of the settlement to interested parties. In August 2017, the district court approved the settlements and entered the bar orders over the objections of the Florida, Texas, and Able Plaintiffs-Objectors. The Plaintiffs-Objectors appeal.

---

[23] The Able Plaintiffs-Objectors also included five individual investors who would have destroyed diversity in the litigation in the Northern District of Texas. Those five investors therefore joined an existing suit by Stanford investors against Willis in Harris County, Texas.

Nos. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

## III.

### A.

The Plaintiffs-Objectors argue that the district court lacked subject matter jurisdiction to bar claims not before the court. Alternatively, they argue the bar orders were an improper exercise of the district court's power over the receivership. We review the district court's subject matter jurisdiction de novo[24] and review the settlement for abuse of discretion.[25]

#### 1.

##### a.

Equity receiverships are older than this country and were looked to in the aftermath of the 1929 financial crash, when Congress created the SEC to protect investors and financial markets. Drawing upon the explicit provisions of Article III, in turn drawn from England's Chancery Court, Congress conferred jurisdiction on the district courts over SEC enforcement actions, including both "suits in equity" and actions at law.[26] In so doing, it granted the SEC access to the courts' full powers, including use of the traditional equity receivership, to coordinate the interests in a troubled entity and to ensure that

---

[24] *See Crane v. Johnson*, 783 F.3d 244, 250 (5th Cir. 2015).

[25] *SEC v. Safety Fin. Serv., Inc.*, 674 F.2d 368, 373 (5th Cir. 1982).

[26] 15 U.S.C. § 77v(a) ("The district courts of the United States . . . shall have jurisdiction of offenses and violations under this subchapter and under the rules and regulations promulgated by the Commission in respect thereto . . . . of all suits in equity and actions at law brought to enforce any liability or duty created by this subchapter."); *Id.* § 78aa(a) ("The district courts of the United States . . . shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder."); *see also* James R. Farrand, *Ancillary Remedies in SEC Civil Enforcement Suits*, 89 HARV. L. REV. 1779, 1782 (1976) ("[T]he 1933 and 1934 Securities Acts[] have specifically conferred equity jurisdiction on the courts").

Nos. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

its assets are fairly distributed to investors.[27] These implicit authorizations of receiverships are consistent with the more general express authorization Congress provided in 28 U.S.C. § 3103. Otherwise stated, the deploy of "[f]ederal equity receiverships, despite the name," nests in "a federal statutory framework."[28]

Exercising their jurisdiction under the securities laws, federal district courts can utilize a receivership where a troubled entity, bedeviled by their violation, will be unable to satisfy all of its liabilities to similarly situated investors in its securities.[29] Without a receiver, investors encounter a collective-action problem: each has the incentive to bring its own claims against the entity, hoping for full recovery; but if all investors take this course of action, latecomers will be left empty-handed. A disorderly race to the courthouse ensues, resulting in inefficiency as assets are dissipated in

---

[27] *SEC v. Wencke*, 783 F.2d 829, 837 n.9 (9th Cir. 1986) ("Our court, like many others, has recognized that as part of courts' equitable powers under the Securities Acts of 1933 and 1934, it may impose receiverships in securities fraud actions to prevent further dissipation of defrauded investors' assets."); *cf. SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1103 (2d Cir. 1972) ("It is now well established that Section 22(a) of the 1933 Act, 15 U.S.C. § 77v(a) (1970), and Section 27 of the 1934 Act, 15 U.S.C. § 78aa (1970), confer general equity powers upon the district courts."); *Janvey v. Alguire*, No. 3:09-CV-0724-N, 2014 WL 12654910, at *16 (N.D. Tex. July 30, 2014) (collecting cases); *id.* at *17 ("The purpose of federal equity receiverships is . . . to marshal assets, preserve value, equitably distribute to creditors, and, either reorganize, if possible, or orderly liquidate."); *see also* Farrand, *Ancillary Remedies, supra* note 25, at 1788 (observing that the equity receivership has been recognized "as one means to effectuate the purposes of a statutory scheme of regulation.").

[28] *Alguire*, 2014 WL 12654910 at *14.

[29] *Liberte Capital Grp., LLC v. Capwill*, 462 F.3d 543, 552–53 (6th Cir. 2006) ("The inability of a receivership estate to meet all of its obligations is typically the sine qua non of the receivership.").

Nos. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

piecemeal and duplicative litigation. The results are also potentially iniquitous, with vastly divergent results for similarly situated investors.

So it is that at the behest of the SEC the district court may take possession of the entity and its assets and vest control in a receiver.[30] The receiver is not an agent of the parties, nor is he like any other party affected by the wrongdoing of the entity's leaders—in this case, by way of a classic Ponzi scheme. He is "an officer or arm of the court . . . appointed to assist the court in protecting and preserving, for the benefit of all parties concerned, the properties in the court's custody[.]"[31]

Once a receiver takes control of a corporation whose officers ran a Ponzi scheme, the corporation is liberated from the control of those wrongdoers. As Judge Posner put it, the corporation is no longer the "evil zombie[]" of the malefactors.[32] The corporation is now "[f]reed from [their] spell" and is under the receiver's control.[33] The receiver, standing in the shoes of the injured corporations,[34] is entitled to pursue the corporation's claims "for the benefit not

---

[30] *Atl. Tr. Co. v. Chapman*, 208 U.S. 360, 370–71 (1908).

[31] *Crites, Inc. v. Prudential Ins. Co. of Am.*, 322 U.S. 408, 414 (1944); *see Certain Underwriters at Lloyds London v. Perraud*, 623 F. App'x 628, 637 (5th Cir. 2015) (unpublished) ("[A] receiver is 'not an agent of the parties,' and is instead 'considered to be an officer of the court.'" (quoting 12 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2981 (2d ed. 2015)).

[32] *Scholes v. Lehmann*, 56 F.3d 750, 754 (7th Cir. 1995).

[33] *Id.*

[34] *Matter of Still*, 963 F.2d 75, 77 (5th Cir. 1992) (explaining that a receiver "stands in the shoes of the failed bank, marshals the assets, and administers a fund"). Here, the receiver asserts the Stanford entities' claims against BMB and Willis. Through their misrepresentations, the insurers actively participated in Robert Allen Stanford's scheme to unlawfully employ the Stanford entities in the Ponzi scheme. In so doing, BMB and Willis breached their fiduciary duties to the Stanford entities.

Nos. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

of [the wrongdoers] but of innocent investors."[35] The receiver is therefore allowed to curb investors' individual advantage-seeking in order to reach settlements for the aggregate benefit of investors under the court's supervision. As directed by the court, a receiver may systematically use ancillary litigation against third-party defendants to gather the entity's assets. Once gathered, these assets are distributed through a court-supervised administrative process.[36]

For this exercise, the federal district courts draw upon "the power . . . [to] impose a receivership free of interference in other court proceedings."[37] The receivership's role is undermined if investor-claimants jump the queue, circumventing the receivership in an attempt to recover beyond their pro rata share. The court's powers include "orders preventing interference with its administration of the receivership property."[38] As we have stated:

> Courts of Appeals have upheld orders enjoining broad classes of individuals from taking any action regarding receivership property. Such orders can serve as an important tool permitting a district court to prevent dissipation of property or assets subject to multiple claims in various locales, as well as preventing

---

[35] *Scholes*, 56 F.3d at 754.

[36] *Liberte*, 462 F.3d at 551 ("The receiver's role, and the district court's purpose in the appointment, is to safeguard the disputed assets, administer the property as suitable, and to assist the district court in achieving a final, equitable distribution of the assets if necessary.").

[37] *SEC v. Wencke*, 622 F.2d 1363, 1372 (9th Cir. 1980).

[38] *Schauss v. Metals Depository Corp.*, 757 F.2d 649, 654 (5th Cir. 1985); *SEC v. Stanford Int'l Bank, Ltd.*, 424 F. App'x 338, 340 (5th Cir. 2011) (unpublished) ("It is axiomatic that a district court has broad authority to issue blanket stays of litigation to preserve the property placed in receivership pursuant to SEC action.").

Nos. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

piecemeal resolution of issues that call for a uniform
result.[39]

These can include both stays of claims in other courts against the receivership[40] and bar orders foreclosing suit against third-party defendants with whom the receiver is also engaged in litigation.[41] Accordingly, at an earlier stage in the litigation we affirmed the district court's order enjoining the Texas Plaintiffs-Objectors from prosecuting claims against Willis during the pendency of the receiver's action.[42]

**b.**

Of course, there are limits to a receivership court's power, here limits that inhere in the focused mission of the Securities Acts, and born of this reality—at its core—the receivership court cannot reach claims that are independent and non-derivative and that do not involve assets claimed by the receivership.[43] As we will explain, the bar orders here, as applied to the objecting investors, fall squarely within these limits: The objecting investors can participate in the receivership process, their claims are derivative of and dependent on the receiver's claims, and their suits directly affect the receiver's assets.

*SEC v. Kaleta* and *SEC v. DeYoung* are fact-bound cases that illustrate both the central role of the federal district court and the limits on that court's

---

[39] *Schauss*, 757 F.2d at 654 *(*internal quotation mark and citation omitted); *see also SEC v. Byers*, 609 F.3d 87, 92 (2d Cir. 2010) ("An anti-litigation injunction is simply one of the tools available to courts to help further the goals of the receivership.").

[40] *See Schauss*, 757 F.2d at 653; *Byers*, 609 F.3d at 93; *Liberte,* 462 F.3d at 551–52.

[41] *SEC v. Kaleta*, 530 F. App'x 360, 362 (5th Cir. 2013) (unpublished).

[42] *Rishmague v. Winter*, 616 F. App'x 138 (5th Cir. 2015) (unpublished).

[43] *SEC v. Stanford Int'l Bank*, 927 F.3d 830 (5th Cir. 2019) (hereinafter *Lloyds*).

authority. In *Kaleta*, the SEC initiated an enforcement action against Kaleta Capital Management and related entities, alleging a fraudulent scheme.[44] As here, the district court appointed a receiver to take custody of and represent the troubled Kaleta entities.[45] Pursuant to its appointment order, the Kaleta receiver sued the third-party Wallace Bajjali Entities to recoup proceeds of Kaleta's alleged violation of the federal securities laws. After months of investigation and negotiation, the parties reached a proposed settlement, under which the defendants would exchange payment for the receiver's release of claims,[46] conditioned on a bar order enjoining all other claims against the Wallace Bajjali Entities by Kaleta's investors—non-parties—arising out of the fraudulent scheme.[47] A number of Kaleta investors objected to the settlement, arguing the district court lacked authority to bar claims not before the court.[48] When the district court approved the settlement and entered the bar order, the objectors appealed.

We upheld the bar order, explaining that it was necessary to guarantee settlement and to ensure that key members of the fraudulent scheme paid the receivership.[49] The bar order's scope was limited, reaching only those claims arising from the allegedly fraudulent notes issued by the settling parties.[50]

---

[44] *See* 530 F. App'x 360 (5th Cir. 2013) (unpublished); *SEC v. Kaleta*, 2012 WL 401069, at *1 (S.D. Tex. Feb. 7, 2012).

[45] *Id.*

[46] *Id.* at *2.

[47] *Id.* at *3.

[48] *Id.* at *7.

[49] *Kaleta*, 530 F. App'x at 362–63; *Lloyds*, 927 F.3d at 843 (noting that the bar order in *Kaleta* "protected the assets of the receivership estate" by "forestalling a race to judgment that would have diminished the recovery of all creditors against receivership assets").

[50] *Kaleta*, 530 F. App'x at 362–63.

That is, it was limited to duplicative claims arising from the same fraudulent scheme. And the settlement permitted the objecting investors to participate in the receiver's distribution process.[51]

In *SEC v. DeYoung*, the SEC sued retirement-account administrator APS, and, as here, the district court took custody of the troubled company and appointed a receiver.[52] The receiver then pursued a third party, First Utah Bank, seeking recovery for the Bank's failure to protect APS account holders.[53] The suit between the receiver and First Utah Bank settled,[54] conditioned on the district court's approval of a bar order that would enjoin suits by non-party APS account holders against First Utah Bank.[55] Individual APS account holders objected, arguing the district court exceeded its authority because it barred claims "belong[ing] exclusively to the individual Account Holders" not before the court; the receiver, they argued, lacked standing to assert these claims.[56] The Tenth Circuit disagreed, finding that the receiver had standing to sue First Utah Bank on behalf of the receivership entity and that the court had subject matter jurisdiction to enter the bar order.[57] The court's equitable powers authorized it to bar claims "substantially identical" to those brought by the receiver.[58] The account holders' and receiver's claims were said to be "substantially identical" because they involved "the same loss, from the same

---

[51] *Id.*
[52] 850 F.3d 1172, 1175 (10th Cir. 2017).
[53] *Id.* at 1176.
[54] *Id.* at 1175.
[55] *Id.* at 1178
[56] *Id.* at 1180–81.
[57] *Id.* at 1181–82.
[58] *Id.* at 1176–83.

Nos. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

entities, related to the same conduct, and arising out of the same transactions and occurrences by the same actors."[59]

**c.**

The case at hand is one of several ancillary suits under the primary SEC action to enforce the federal securities laws against Robert Allen Stanford and his Ponzi-scheme co-conspirators.[60] There is no dispute that the receiver and Investors' Committee had standing to bring their claims against Willis and BMB. They bring only the claims of the Stanford entities—not of their investors[61]—alleging injury to the Stanford entities, including the unsustainable liabilities inflicted by the Ponzi scheme. The receiver and Investors' Committee "allege that Defendants' participation in a fraudulent marketing scheme increased the sale of Stanford's CDs, ultimately resulting in greater liability for the Receivership Estate," and that defendants "harmed the Stanford Entities' ability to repay their investors." The receiver and Investors' Committee sought to recover for the Stanford entities' Ponzi-scheme

---

[59] *Id.* at 1176. As pointed out in *Lloyds*, the *DeYoung* Court also gave significant weight to First Utah's contractual right to indemnification from APS. *Id.* at 1183. This right meant that APS, now controlled by the receiver, could be required to indemnify First Utah for claims brought by the objecting account holders. This was significant because the barred claimants would have been paid by the Bank, draining the receiver's assets as a result of the indemnification. *Id.*

[60] *Janvey v. Reeves-Stanford*, 2010 WL 11463486, at *3 (N.D. Tex. Nov. 18, 2010) (quoting *Crawford v. Silette*, 608 F.3d 275, 278 (5th Cir. 2010) ("[T]he initial suit which results in the appointment of the receiver is the primary action and . . . any suit which the receiver thereafter brings in the appointment court in order to execute such duties is ancillary to the main suit . . . .").

[61] *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 190 (5th Cir. 2013) ("[A] federal equity receiver has standing to assert only the claims of the entities in receivership, and not the claims of the entities' investor-creditors."); *Scholes*, 56 F.3d at 753 ("[A] receiver does not have standing to sue on behalf of the creditors of the entity in receivership. Like a trustee in bankruptcy or for that matter the plaintiff in a derivative suit, an equity receiver may sue only to redress injuries to the entity in receivership.").

Nos. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

harms, monies the receiver will distribute to investor-claimants. The district court had subject matter jurisdiction over these claims.

**d.**

The Plaintiffs-Objectors urge that their claims are independent and distinct from those asserted by the receiver and Investors' Committee. Some argue that the bar orders entail the district court's assertion of jurisdiction to settle their claims pending in other judicial proceedings and that their claims sound in tort or contract. They are mistaken. It is necessarily the case that where a district court appoints a receiver to coordinate interests in a troubled entity, that entity's investors will have hypothetical claims they could independently bring but for the receivership: the receivership exists precisely to gather such interests in the service of equity and aggregate recovery.

A few Plaintiffs-Objectors also assert that the bar orders cannot apply to their misrepresentation claims because the settling defendants had direct contact with them by way of letters misrepresenting Stanford's financial soundness. There are two problems with this argument. First, they do not cite, and we have not found, case law supporting this direct- versus indirect-contact distinction. Second, the unchallenged findings of the district court show that their contact—letters on the letterhead of the defendant companies—was mediated by Stanford executives:

> The Willis and BMB Defendants allegedly aided Stanford's fraud by misrepresenting the safety and security of the SIBL CDs. In particular, they allegedly allowed Stanford employees to draft insurance endorsement letters that the Willis and BMB Defendants then placed on their own letterhead. Prospective Stanford investors received these letters as marketing tools designed to generate more investments in SIBL CDs. The Willis

25

Nos. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

and BMB Defendants provided these letters despite allegedly knowing that Stanford was defrauding.[62]

Indeed, the letters provided at the hearing on the objectors' claims were signed by either a Stanford board member or a Willis employee.[63] Both were named in the Receiver's suit as participants in the Ponzi scheme, and both settled with the Receiver.[64] Other Plaintiffs-Objectors attempt to distinguish themselves with different theories of liability for the Ponzi scheme. They say, "Well, our suit is for fraud under state law," or, "We had direct contact."

This is word play. The only contact the objectors had was with the scheme in operation—the Ponzi scheme is a tissue of myriad lies and misrepresentations; a "direct contact" by receipt of a letter framed by Bank employees and certified by either or both of the two defendant companies says nothing. The objectors were injured by the Ponzi scheme. These objecting investors rode the Receiver train until the end and then decided to hold up a settlement with a deep pocket.[65]

---

[62] *Zacarias*, No. 3:09-CV-00298-N, 2017 WL 9989250, at *1 (N.D. Tex. Aug. 23, 2017).

[63] *See* Defendants' Letters, *Zacarias*, No. 3:09-CV-00298-N, ECF Nos. 2465-2 to 4, 6, 14 to 16.

[64] *Janvey v. Willis*, 3:09-cv-01274-N-BQ (N.D. Tex. Nov. 7, 2016), ECF Nos. 279, 280.

[65] It has been argued that our case is analogous to the Sixth Circuit's unpublished opinion in *Liberte Capital Grp., LLC v. Capwill*, 248 F. App'x 650 (6th Cir. 2007) (unpublished). In *Liberte*, the district court appointed a receiver to marshal the assets of two companies that had invested and served as escrow agents for funds obtained through the sale of fraudulent insurance policies. *Id.* at 651–52. Later, individual purchasers of those policies filed arbitration claims against their broker-dealers for fraudulently inducing them to buy the policies. The Sixth Circuit held that the receiver could not swallow individual purchasers' claims as part of the receivership estate because the receivership entities did not suffer any injury from the broker-dealers' conduct. *Id.* at 656. This is in stark contrast to our case, where the Stanford entities and individual investors were indisputably harmed by the insurers' misrepresentations of the Bank's financial soundness—they were part of the Ponzi scheme.

26

Nos. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

By entering the bar orders, the district court recognized the reality that, given the finite resources at issue in this litigation, Stanford's investors must recover Ponzi-scheme losses through the receivership distribution process. Stanford, Willis, and BMB are alleged to be co-conspirators in the Ponzi scheme. The receiver is suing them to recover for the additional liability Stanford incurred to its investors, allegedly by virtue of Willis's and BMB's participation in the scheme. In other words, Plaintiffs-Objectors' suits are derivative of and dependent on the receiver's claims and compete with the receiver for the dollars in Willis's and BMB's pockets. The Plaintiffs-Objectors' claims affect receivership assets because every dollar the Plaintiffs-Objectors recover from Willis and BMB is a dollar that the receiver cannot, frustrating the receiver's pro rata distribution to investors—a core element of its draw upon equity.

Willis and BMB negotiated for the bar orders as preconditions of their respective settlements. The brokers' incentives to settle are reduced—likely eliminated—if each SIB CD investor retains an option to pursue full recovery in individual satellite litigation. Such resolution is no resolution. And the costs of undermining this settlement are potentially large. The receivership—and thus qualifying investor claimants—would be deprived of $132 million in settlement proceeds. Continued prosecution of the receiver and Investors' Committee's suit against Willis and BMB could result in the same if not greater recovery, but this is speculation. Further, any potential value of the receiver's ultimate recovery must be reduced by the costs of prolonged litigation over the same assets, not only in the receiver's own action but also in the Plaintiffs-Objectors' myriad satellite suits, into which the receivership is

27

likely to be drawn. Supposing that Willis, an allegedly deep-pocketed defendant, remains able to satisfy any judgment against it, the same cannot be said of BMB: continued litigation would eat away at the limited funds available under its "wasting" insurance policy.[66]

**e.**

*Zacarias* and *Lloyds* do not conflict. Each responded to distinct, critical differences in fact. *Lloyds* reviewed bar orders entered by the same receivership court in connection with the Stanford receiver's $65 million settlement with Lloyds and Arch Specialty Insurance Co.[67] The *Lloyds* bar orders enjoined third-party litigation against the defendant underwriters who had settled with the receiver.[68] These underwriters, unlike BMB and Willis, did not participate in the Ponzi scheme. And it was under those insurance policies that the receiver in *Lloyds* sued them. In response to the settlement, objectors challenged the bar orders. Two sets of objectors are relevant here: (1) former Stanford employees who were coinsured with Stanford by Lloyds and Arch; and (2) a group of Louisiana retirees—former investors defrauded by the Ponzi scheme—claiming a right to direct action under a state statute.

The first group, the former Stanford employees, sought coverage under the Lloyds and Arch policies to defend against the receiver's clawback suits.[69] They also brought state-law claims resulting from Lloyd's handling of their

---

[66] A "wasting" insurance policy has coverage limits that are reduced as defense costs are incurred.

[67] *Lloyds*, 927 F.3d 830 (5th Cir. 2019).

[68] *Id.* at 838.

[69] *See id.* at 845–47.

claims for coverage.[70] *Lloyds* held that the receivership court abused its discretion by barring the contractual claims without channeling them into the receivership trust's distribution process.[71]

*Lloyds* held that the extracontractual claims, on the other hand, could not properly be reached by the bar orders at all, as they were based on the insurers' conduct in denying the Stanford employees' claims for policy proceeds, a distinct tort injury not based on any conduct in furtherance of the Ponzi scheme. These claims were independent of the receiver's claims and belonged only to the officers.

As to the Louisiana investors, *Lloyds* upheld the bar order, explaining that though styled as statutory claims under Louisiana's direct action law, their claims "amount[ed] to a redundant claim on receivership assets."[72] Further, because the investors had the opportunity to participate in the distribution of the receivership estate, their claims were adequately channeled.

Much of *Lloyds* dealt with issues not presented in this case. The defendants in *Lloyds* did not participate in the Ponzi scheme; they only insured the Stanford entities. But the defendants here were active co-conspirators in the Ponzi scheme. Likewise, many of the *Lloyds* objectors were former Stanford employees suing to enforce insurance policies.[73] By contrast, the objectors here are defrauded investors. Once these facts are understood, the compatibility of

---

[70] *See id.* at 847–48.

[71] *Id.* at 847.

[72] *Id.* at 850.

[73] The employees' claims could not be asserted by the receiver. Indeed, they arose only after the Ponzi scheme had been detected and the receiver had commenced clawback suits against the objecting Stanford employees.

Nos. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

the opinions is plain, for where these cases addressed analogous claims, they reached the same conclusion for the same reasons: Both affirm the receivership court's power to bar investors' claims for injuries they suffered as a direct result of the Ponzi scheme.[74] And we address only investors.[75]

\*    \*    \*

In this appeal we address only the effect of the Willis and BMB bar orders enjoining third-party investors' claims. The receiver initiated the suit, negotiated, and settled with Willis and BMB while empowered to deal with potential investor holdouts like the Plaintiffs-Objectors. These holdouts have been content for the receiver to pursue litigation for their benefit, then to participate as receivership claimants, collecting pro rata. Now, however, they ask to jump the queue, come what may to their fellow claimants who remain within the receivership distribution process. At bottom, the Plaintiffs-Objectors seek special treatment: their efforts to escape pro rata distribution, if successful, would recreate the collective-action problem that Congress sought to eliminate. The bar orders enjoining these investors' third-party claims fall well within the broad jurisdiction of the district court to protect the receivership res. The exercise of jurisdiction over a receivership is not an exercise of jurisdiction over other judicial proceedings. Rather, it permits the barring of such proceedings where they would undermine the receivership's operation.

---

[74] The Louisiana retirees in *Lloyds* and all objectors here are Stanford investors.

[75] *Lloyds* noted that the receiver may not bar investor claims that do not implicate the policy proceeds because such claims would not affect the receivership estate. *Id.* at 849. But this principle has no application here, where the objecting investors' claims have nothing to do with insurance policies but rather with the insurers' conduct as participants in the fraud and, as discussed above, would affect the receivership.

Nos. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

**2.**

Again, the receivership solves a collective-action problem among the Stanford entities' defrauded investors, all suffering losses from the same Ponzi scheme. It maximizes assets available to them and facilitates an orderly and equitable distribution of those assets. Allowing investors to circumvent the receivership would dissolve this orderly process—circumvention that must be foreclosed for the receivership to work. It was no abuse of discretion for the district court to enter the bar orders to effectuate and preserve the coordinating function of the receivership.

**B.**

Under the Anti-Injunction Act, "[a] court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."[76] That is, "federal injunctive relief may be necessary to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case."[77] Guided by principles of federalism, we "find[] a threat to the court's jurisdiction" where "a state proceeding threatens to dispose of property that forms the basis for federal in rem jurisdiction."[78]

The district court exercises jurisdiction over the receivership estate. The particular part of that res at issue here is $132 million receivable owed to the

---

[76] 28 U.S.C. § 2283.

[77] *Atl. Coast Line R. Co. v. Bhd. of Locomotive Engineers*, 398 U.S. 281, 295 (1970).

[78] *Texas v. United States*, 837 F.2d 184, 186 n.4 (5th Cir. 1988); *see Newby v. Enron Corp.*, 302 F.3d 295, 301 (5th Cir. 2002).

31

Nos. 17-11073
c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

receivership, conditioned upon the BMB and Willis bar orders. When in 2009 the district court took the receivership estate into its custody, the res "[wa]s as much withdrawn from the judicial power of the other [courts], as if it had been carried physically into a different territorial sovereignty."[79] The Plaintiffs-Objectors' suits in state court implicate that same res. The formal distinction between the Plaintiffs-Objectors' and the receivers' claims against the brokers arises from the receivership's mediating role, interposed by the district court between the investors and the assets belonging to the Stanford entities. The receiver sues the two brokers, as participants in the Ponzi scheme, on behalf of the Stanford entities so that assets owed to investors can be distributed to them administratively, through the distribution process rather than through their own piecemeal satellite litigations: "any proceeds of the [Plaintiffs-Objectors'] claim are potential receivership assets, falling squarely within the bounds of the Receivership Order."[80]

The bar orders here prevent Florida and Texas state-court proceedings from interfering with the res in custody of the federal district court. The bar orders aided the court's jurisdiction over the receivership entities, which remain in the custody of the court. The bar orders negotiated here were a legitimate exercises of the receiver's authority—indeed, the receiver's duty, all under the aegis of an Article III court.

## C.

The Texas and Florida Plaintiffs-Objectors argue that the Willis bar order deprived them of their property (that is, their claims) without due process

---

[79] *Covell v. Heyman*, 111 U.S. 176, 182 (1884).

[80] *Rupert*, 2012 WL 13102348 at *7; *see also Rishmague*, 2014 WL 11633690 at *3.

32

and without just compensation. This is a recasting of the jurisdictional argument we have rejected. The district court was empowered to bar judicial proceedings not before it to protect the receivership. In so doing, the court afforded the Plaintiffs-Objectors all the process due: notice and opportunity to be heard on the proposed settlement and bar orders—an opportunity they seized. They were not deprived of any entitlement to recovery: the bar orders channel investors' recovery associated with BMB and Willis through the receivership's distribution process. As SIB CD investors, Plaintiffs-Objectors were provided notice of the receivership's distribution process; they were afforded an opportunity to submit proofs of claim, and to dispute the receiver's disposition of their entitlements within the receivership's administrative distribution process, including judicial review. The district court's decision to channel the Texas and Florida Plaintiffs-Objectors' recovery into that receivership process does not deprive them of an entitlement to recover for Ponzi-scheme losses. All due process has been afforded.

**D.**

The Plaintiffs-Objectors challenge the settlement agreements and bar orders, inferring from the large settlement sums that these are "de facto class settlements" entered unlawfully without certification of a settlement class.[81] There is a kinship—at a high level—in function between the receivership and a hypothetical certified SIB CD investor class action: both offer means to pursue litigation in an aggregative form. In the former, the court channels

---

[81] The Able Plaintiffs-Objectors also argue that in entering the Willis settlement, the Troice Parties violated their fiduciary duties to members of the putative class of SIB CD investors. The claim fails for the same reason as the other Rule 23 challenges.

recovery through its officer, the receiver, and retains power to bar parallel proceedings that would interfere. In the latter, investors pursue their entitlements via class representatives under the requirements of Rule 23. But, as Congress authorized in protection of its security markets, the district court appointed a receiver and did not certify an investor class. The Willis and BMB settlements bring monies ultimately to be distributed to all SIB CD investor-claimants through the receivership. There was no illicit class settlement, and the bar orders do not offend Rule 23.

## E.

The Texas Plaintiffs-Objectors argue that the bar orders deny their right to a jury trial, retreading the jurisdictional argument we have addressed. Their argument presumes the Objector-Plaintiffs were otherwise entitled to pursue their independent action in state court unconstrained by the receivership court's bar order. We have explained why they have no such entitlement. The right to a jury does not create a right to proceed outside the receivership proceeding.

## F.

The district court did not abuse its discretion in approving the BMB and Willis settlement agreements. The Texas Plaintiffs-Objectors argue that a "far greater recovery was possible," that the settlement was premature, and that SIB CD investors could have recovered 100 percent of their investments. This is at best speculative. The settlement was reached after years of investigation and litigation. There was no certainty in the outcome of the Receivership Action. The defendant brokers contested liability and insist they would continue to do so if the settlements are terminated, including a defensive

narrative that they, like so many other persons and businesses, were duped. It remained for the plaintiffs to prove their claims at trial, including proving the brokers' role in the Ponzi scheme without the benefit of an aiding and abetting violation under Rule 10b-5. The potential benefits of continued litigation must be discounted by the risk of failing in that proof or in overcoming defenses, together with attendant costs, mindful that to succeed it would not be enough for these private litigants to prove that the brokers "aided and abetted."[82] The district court considered tradeoffs the parties faced with the prospect of settlement and found the settlements "consistent with interests of both the receivership and the investors." The district court found no evidence of fraud or collusion and did not abuse its discretion in approving the settlements.

## IV.

The core difficulty with Plaintiffs-Objectors' efforts to go it alone is that it would frustrate the central purposes of the receivership and confound the SEC's mission to achieve maximum recovery from the malefactors for distribution pro rata to all investors. We affirm the district court's approval of the BMB and Willis settlements and its entry of the corresponding bar orders enjoining the Plaintiffs-Objectors' third-party investor claims.

---

[82] The SEC has the unique authority to use aider-and-abettor liability under § 10(b) of the Securities Exchange Act of 1934. *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164 (1994) (holding a private party may not maintain an aider-and-abettor suit under § 10(b)), *overridden in part by* Private Securities Litigation Reform Act of 1995, § 104, Pub. L. No. 104–67, 109 Stat. 737, 757 (reaffirming the SEC's authority to bring civil enforcement actions against aiders and abettors).

Nos. 17-11073

c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

DON R. WILLETT, Circuit Judge, dissenting:

I share the majority's appreciation for this settlement's practical value. We agree too that for a receiver to have standing to resolve creditors' claims and for the district court to have subject-matter jurisdiction to issue a bar order, the creditors' claims must be "substantially identical" to the receiver's claims.[1] Our disagreement concerns a narrow issue: whether the Objectors' claims were the same as the Receiver's just because they both have origins in the same Ponzi scheme. In my judgment, the claims are distinct and thus beyond the district court's power.

\*      \*      \*

Willis of Colorado, Inc., its affiliates, and Bowen, Miclette and Britt, Inc. injured the Stanford entities by failing to thwart the Ponzi scheme.[2] They turned a blind eye to Stanford officers' misdeeds—*inaction*. So the Receiver asserted breach of fiduciary duty and negligence claims against them. But Willis and BMB separately injured the Objectors. They sent the Objectors letters misrepresenting Stanford's soundness and its insurance coverage—*action*. So the Objectors asserted fraud and negligent misrepresentation against them. The Objectors' injuries are separate from Stanford's, and they resulted from separate action—or inaction—by Willis and BMB.

---

[1] *See SEC v. Stanford International Bank, Ltd.*, 927 F.3d 830, 835–36 (5th Cir. 2019) ("The prohibition on enjoining unrelated, third-party claims without the third parties' consent . . . is a maxim of law not abrogated by the district court's equitable power to fashion ancillary relief measures."); *SEC v. DeYoung*, 850 F.3d 1172, 1178–79 (10th Cir. 2017) (finding that receiver had standing to settle individual victims' claims through a bar order where their claims involved "the same parties, the same conduct, the same actors, the same transactions and occurrences, the same existence of indemnity claims[,] . . . and the claims [were] all from the same loss" (quoting district court findings)).

[2] These facts are taken from the Receiver's and Objectors' pleadings. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

Nos. 17-11073

c/w 17-11114, 17-11122, 17-11127, 17-11128, 17-11129

The Receiver contends that the Objectors' claims are "factually intertwined" with its own. But having defendants in common (Willis and BMB) or having a common destination for the plunder (Stanford officers) does not make claims the same.[3] And the Objectors' right to participate in the receivership claims process does not change this. That process pays for *Stanford's* liability out of *Stanford's* assets. It will not and cannot cover *Willis and BMB*'s distinct liability to the Objector's for their separate, affirmative actions against the individual Objectors.

\*    \*    \*

Federal courts cannot decide a claim's fate outside the "honest and actual antagonistic assertion of rights."[4] For better or worse, the Objectors' claims are distinct from the Receiver's, meaning the district court lacked jurisdiction to adjudicate them, or to enjoin them. I would thus vacate the bar orders. As the majority does otherwise, I respectfully dissent.

---

[3] *See, e.g.*, *N.Y. Life Ins. Co. v. Gillispie*, 203 F.3d 384, 387 (5th Cir. 2000) (requiring same "nucleus of operative fact" for claim identity).

[4] *United States v. Johnson*, 319 U.S. 302, 305 (1943) (quoting *Chi. & G.T. Ry. Co. v. Wellman*, 143 U.S. 339, 345 (1892)).

37